Barbara A. BROCKLESBY, et al.,
Plaintiffs-Appellees,

v.

UNITED STATES of America,
Defendant-Appellee,

and

Jeppesen and Company,
Defendant-Appellant.

No. 83–2336.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 11, 1984.

Decided Feb. 15, 1985.

Albert Abramson, San Francisco, Cal., Richard Clark, U.S. Dept. of Justice, Washington, D.C., Daniel U. Smith, Kentfield, Cal., for appellees.

Nicholas W. Heldt, Gregory C. Read, Sedgwick, Detert, Moran & Arnold, San Francisco, Cal., for defendant-appellant.

Before CANBY, NORRIS and BEEZER, Circuit Judges.

BEEZER, Circuit Judge:

Barbara Brocklesby, Nancy Evans, Frank Evans, Katherine Evans, Norma Chapman, and World Airways, Inc. (collectively "the plaintiffs") brought this action against the United States of America ("the Government") and Jeppesen and Company ("Jeppesen"), seeking damages for wrongful deaths and property damage arising from an airplane crash near Cold Bay, Alaska. In a bifurcated trial, the jury returned a verdict against Jeppesen. Before the district court disposed of claims against the Government, the Government settled with the plaintiffs. An order dismissing the Government was entered. Jeppesen appeals from the jury verdict and seeks indemnification from the Government. We affirm.

# I

## BACKGROUND

On September 8, 1973, an aircraft owned by World Airways crashed into a mountain near Cold Bay, Alaska, killing all six crew members and destroying the aircraft and its contents. World Airways and the survivors of the deceased crew members brought separate actions against the Government and Jeppesen, alleging, *inter alia,* that the accident was caused by defects in an instrument approach procedure developed by the Government and published by Jeppesen. The actions were consolidated for trial.

The Federal Aviation Administration ("FAA") designs and publishes standard instrument approach procedures. *See* 14 C.F.R. pt. 97. The FAA's instrument approach procedures are essentially compilations of data, which are set forth in tabular form. Jeppesen uses the FAA's data to portray the instrument approach procedures in graphic form. One of Jeppesen's charts depicts the instrument approach procedure to the Cold Bay, Alaska airport. On the flight at issue in this case, World Airways' pilot was using that chart.

Prior to trial, the Government and Jeppesen entered into a stipulation of compromise settlement ("the indemnity agreement"). The indemnity agreement resolved the claims between the Government and Jeppesen, subject to various conditions. One of the conditions required the parties to submit special interrogatories to the trier of fact. Over the defendants' objections, the district court admitted the indemnity agreement into evidence.

Because the claims against the Government were governed by the Federal Tort Claims Act, the plaintiffs had no right to a jury trial on those claims. *See* 28 U.S.C. § 2402. As a result, the trial was bifurcated, with a jury deciding the claims against Jeppesen and the court deciding the claims against the Government. The case was submitted to the jury under three theories: negligence, breach of warranty, and strict liability. The jury returned a general verdict against Jeppesen in the amount of $11,630,000. The district court refused to submit special interrogatories to the jury involving the indemnity issues and later refused to answer the interrogatories itself.

Shortly after the district court refused to submit the interrogatories to the jury, the Government settled with the plaintiffs for $5 million. The Government was then dismissed from the suit. The district court denied a motion by Jeppesen to enforce the indemnity agreement.

The district court awarded prejudgment interest in the amount of $6,155,580.81 to World Airways with regard to its claim for the market value of the aircraft. After crediting the $5 million settlement, the district court entered a final judgment for $12,785,580.81 in favor of the plaintiffs and against Jeppesen.

# II

## ANALYSIS

A. *The Indemnity Agreement*

1. *Admissibility*

Federal Rule of Evidence 408 bars the admission of settlement agree-

ments to prove liability. *See generally* 23 C. Wright & K. Graham, *Federal Practice and Procedure* §§ 5301–5315 (1980). The final sentence of Rule 408 provides the exception that is at issue in this case: "This rule ... does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness...." Jeppesen contends that the only purpose for admitting the indemnity agreement was to prove liability and that the district court abused its discretion by allowing the plaintiffs to introduce it into evidence.[1]

■ The record does not support Jeppesen's position. At trial, the plaintiffs argued that the indemnity agreement was admissible for two purposes. First, the plaintiffs argued that the indemnity agreement was admissible to show the relation-

ship of the parties. The plaintiffs contended that the indemnity agreement showed that Jeppesen and the Government were not adverse.[2] Second, the plaintiffs argued that the indemnity agreement was admissible to attack the credibility of the witnesses for Jeppesen and the Government.[3] The district court admitted the indemnity agreement for those specific purposes.[4] Because those purposes are distinct from proving liability, the district court did not abuse its discretion by admitting the indemnity agreement.[5]

### 2. *Limiting Instruction*

■ Jeppesen contends that the district court committed reversible error by failing to instruct the jury that it could not consider the indemnity agreement as proof

1. We review the district court's decisions regarding the admission of evidence under the abuse of discretion standard. *Paddack v. Dave Christensen, Inc.,* 745 F.2d 1254, 1258 n. 5 (9th Cir.1984).

2. Jeppesen argues that the relationship of the parties was not at issue. The test, however, is not whether the relationship of the parties was an operative fact in the case, but whether it was "relevant" within the meaning of Rule 401. Evidence relating to the relationship of the parties is relevant because it tends to make their respective positions less credible. *See Lewis v. Baker,* 526 F.2d 470, 475 (2d Cir.1975). At a post-trial hearing, Jeppesen's trial counsel admitted that the indemnity agreement altered the relationship between the Government and Jeppesen:

> We didn't shoot at the government. I dropped two expert witnesses on the subject of the government's procedure in reliance on the fact that the government was going to pay if the jury found the procedure was bad.
> I argued in favor of the government, I supported their position, I didn't prosecute, *but the jury knew about the agreement the whole time, so nobody was fooled.* The jury knew from opening statements what our relationship was.

(emphasis added).

3. Jeppesen argues that the indemnity agreement was not used for this purpose. The record reveals, however, that the indemnity agreement was introduced into evidence during the testimony of Wayne Rosenkrans, the president of Jeppesen. In any event, it was not necessary for the plaintiffs to confront each witness with the indemnity agreement. If the existence of the indemnity agreement made the defendants'

witnesses' testimony less credible, it was admissible. *See County of Hennepin v. AFG Industries, Inc.,* 726 F.2d 149, 152–53 (8th Cir.1984); 23 C. Wright & K. Graham, *supra,* § 5311.

4. Jeppesen asserts that the district court allowed the plaintiffs to use the indemnity agreement for any purpose. The record reveals, however, that the district court admitted the indemnity agreement only for these two limited purposes. The record also reveals that Jeppesen never sought a limiting instruction, as is discussed below.

5. Jeppesen also argues that the admission of the indemnity agreement was unfairly prejudicial because the jury could hold Jeppesen liable under the belief that the Government would indemnify Jeppesen. While that theory is not implausible, we note that Jeppesen did not contest the introduction of the indemnity agreement on the basis of unfair prejudice. *See* Fed. R.Evid. 403. Instead, Jeppesen based its objection solely on Rule 408 and general principles of relevance. Jeppesen never even mentioned unfair prejudice at trial. In fact, Jeppesen raised the issue of unfair prejudice for the first time in a motion filed after trial. In the absence of a specific and timely objection, we review the admission of evidence for plain error. Fed.R. Evid. 103(a)(1), (d); *see United States v. Wilson,* 690 F.2d 1267, 1273–74 (9th Cir.1982), *cert. denied,* — U.S. ——, 104 S.Ct. 205, 78 L.Ed.2d 178 (1983); *cf. John McShain, Inc. v. Cessna Aircraft Co.,* 563 F.2d 632, 635 (3d Cir.1977) (implying an objection under Rule 403 from a party's arguments under Rule 408). We conclude that the district court's decision to admit the indemnity agreement was not plain error.

of liability. If a limiting instruction is not requested, any error from failure to give the instruction is waived. *Bock v. United States,* 375 F.2d 479, 480 (9th Cir.1967); *see* Fed.R.Civ.P. 51. Because Jeppesen failed to request an instruction, this issue was not preserved for appeal.[6]

### 3. *Enforceability*

■ Jeppesen claims that the district court erred by refusing to enforce the indemnity agreement. 28 U.S.C. § 1346(a)(2) gives district courts concurrent jurisdiction with the United States Claims Court over "[a]ny civil action or claim against the United States, not exceeding $10,000 in amount, founded ... upon any express or implied contract with the United States." Because Jeppesen's claim against the United States under the indemnity agreement exceeds $10,000, the district court lacked jurisdiction. *Murray v. United States,* 405 F.2d 1361, 1366–67 (D.C.Cir.1968); *see Keene Corp. v. United States,* 700 F.2d 836, 845 n. 13 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); *Glover v. Johns-Manville Corp.,* 662 F.2d 225, 230–32 (4th Cir.1981).

Because the issue of indemnity was not before the jury, the district court was not obligated to submit interrogatories on that issue. The district court concluded that submission of the interrogatories would be confusing and would create a possibility of inconsistent verdicts. The record reveals no grounds for finding that the district court abused its discretion.

### 4. *Due Process*

■ Jeppesen contends that the trial of this case was so fundamentally unfair that Jeppesen did not receive due process of law. We disagree. Jeppesen had a full and fair opportunity to present its case before the district court. If Jeppesen felt that the admission of the indemnity agreement was unfair, a timely and specific objection under Rule 403 or a request for a limiting instruction would have been appropriate.

■ Jeppesen also argues that the admission of the indemnity agreement deprived it of due process because the indemnity agreement eventually became unenforceable. Jeppesen contends that the trial was thus based on false evidence. We disagree. The indemnity agreement was admitted to show the relationship of the parties and to impeach witnesses. At the time of trial, the indemnity agreement was an accurate reflection of the relationship of the parties and the biases, if any, of the witnesses. While the indemnity agreement would have been "false" if it had been admitted to prove that the Government would indemnify Jeppesen, it was not admitted for that purpose. We reject Jeppesen's due process claims.

### B. *Liability*

■ The case was submitted to the jury on three theories of liability: strict liability, breach of warranty, and negligence.[7] The jury returned a general verdict against Jeppesen. Accordingly, the judgment must be reversed if any of the three theories is legally defective. *See Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.,* 370 U.S. 19, 29–30, 82 S.Ct. 1130, 1135–1136, 8 L.Ed.2d 305 (1962); *Jones v.*

---

6. Jeppesen argues that its failure to request the instruction can be excused because the plaintiffs sought an identical instruction, which the district court rejected. The record does not support that argument. The "instruction" that the plaintiffs sought was part of the district court's initial statement to the jury prior to voir dire. None of the parties sought a limiting instruction at the time the evidence was admitted or at any other time.

7. Although the district court never made a finding regarding its choice of law, the parties assume that California law applies. California conflict of laws principles govern this choice. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). We conclude that the California courts would apply California law to this case. *See Kasel v. Remington Arms Co.,* 24 Cal.App.3d 711, 101 Cal.Rptr. 314 (1972). *See generally* R. Weintraub, *Commentary on the Conflict of Laws* § 6.29 (2d ed. 1980) (discussing choice of law problems in products liability cases).

*Miles*, 656 F.2d 103, 106 (5th Cir.1981). Jeppesen argues (1) that this case does not involve a defective "product" for purposes of strict liability, (2) that the defects in the Government's instrument approach procedure will not support a finding of strict liability against Jeppesen, (3) that the evidence produced at trial does not establish negligence, and (4) that various policy considerations bar any tort liability in this case.[8]

### 1. *Strict Products Liability*

#### a. *The Existence of a "Product"*

■ Jeppesen argues that the Government's instrument approach procedure is not a "product" within the meaning of *Restatement (Second) of Torts* § 402A (1965). While that may be true, it misses the point. The issue is whether Jeppesen's chart is a product, not whether the instrument approach procedure is a product. In *Aetna Casualty and Surety Co. v. Jeppesen & Co.*, 642 F.2d 339, 341–42 (9th Cir.1981) (applying Nevada law), we analyzed the problem as follows:

> Jeppesen approach charts depict graphically the instrument approach procedure for the particular airport as that procedure has been promulgated by the Federal Aviation Administration (FAA) after testing and administrative approval. The procedure includes all pertinent aspects of the approach such as directional heading, distances, minimum altitudes, turns, radio frequencies and procedures to be followed if an approach is missed. The specifications prescribed are set forth by the FAA in tabular form. Jeppesen acquires this FAA form and portrays the information therein on a graphic approach chart. This is Jeppesen's "product."

*Accord Saloomey v. Jeppesen & Co.*, 707 F.2d 671, 676–77 (2d Cir.1983) ("Though a 'product' may not include mere provision of architectural design plans or any similar form of data supplied under individually-tailored service arrangements, ... the mass production and marketing of these charts requires Jeppesen to bear the costs of accidents that are proximately caused by defects in the charts.") (applying Colorado law). We agree with the plaintiffs' position that Jeppesen's chart was a defective product for purposes of analysis under section 402A.[9]

#### b. *Liability for Defects in the Government's Procedure*

This case is distinguishable from *Aetna* and *Saloomey* because the Jeppesen chart involved in this case accurately portrayed the instrument approach procedure provided by the Government. All of the defects in the Jeppesen chart stem from the Government's alleged failure to establish a safe instrument approach procedure. The district court instructed the jury as follows:

> Now, the fact that Jeppesen's instrument approach charts are based on information which is supplied by the F.A.A. and which Jeppesen cannot deviate from or modify does not relieve Jeppesen from liability if a defect in the Jeppesen chart was a proximate cause of the accident.

---

**8.** Jeppesen only challenges the breach of warranty theory on the ground that the chart was not a "product."

**9.** Jeppesen cites several cases for the proposition that published ideas are not "products." *Herceg v. Hustler Magazine, Inc.*, 565 F.Supp. 802, 803 (S.D.Tex.1983) (magazine article); *Cardozo v. True*, 342 So.2d 1053 (Fla.Dist.Ct.App.) (recipe in a cookbook), *cert. denied*, 353 So.2d 674 (Fla.1977); *Walter v. Bauer*, 109 Misc.2d 189, 439 N.Y.S.2d 821, 822 (Sup.Ct.1981) (experiment in textbook), *modified on other grounds*, 88 A.D.2d 787, 451 N.Y.S.2d 533 (1982). *See generally* McCowan, *Liability of the Chartmaker*, 47 Ins. Counsel J. 359 (1980). *Cardozo, Walter*,

and *Herceg* stand for the proposition that books and magazines are not rendered defective by their contents. As a result, those cases are distinguishable. The plaintiffs are alleging that the chart was unreasonably dangerous in its intended use because of design defects. In *Cardozo, Walter*, and *Herceg*, on the other hand, books and magazines were not dangerous for their intended use. *E.g., Walter*, 439 N.Y.S.2d at 822 (noting that the plaintiff "was not injured by use of the book for the purpose for which it was designed, i.e., to be read"). By contrast, Jeppesen's chart was allegedly dangerous for the use for which it was designed. *See Saloomey*, 707 F.2d at 676–77.

The manufacturer of a product is strictly liable for defects in that product even though the defect can be traced to a component part supplied by another. Thus if you find that Jeppesen's instrument approach chart is defective and that the defect was a proximate cause of the accident, you must find Jeppesen liable even if the defect exists only because you find that the F.A.A. designed an approach procedure that you find is itself defective. The issue is: was the Jeppesen chart defective?

The validity of that instruction presents a case of first impression.

■ Jeppesen contends that strict liability is inappropriate because the Government's procedure was beyond its control.[10] In essence, Jeppesen is arguing that it should not be held strictly liable because it is without fault in this case. It is beyond doubt that the concept of fault continues to have a role in strict liability law. *See* Powers, *The Persistence of Fault in Products Liability*, 61 Texas L.Rev. 777 (1983). Nevertheless, Jeppesen's position is untenable.

Initially, we note that Jeppesen had at least some ability to prevent injuries to users of its charts. Jeppesen's production specifications manual required its employees to research any procedure thoroughly "to determine its validity and completeness." Jeppesen's president, Wayne Rosenkrans, testified that this requirement applied to the construction and composition of charts such as the one involved in this case. Jeppesen's manual requires its employees to contact official sources to resolve apparent discrepancies in information. Jeppesen maintained an office in Washington, D.C. with liaison to the FAA. Rosenkrans testified that Jeppesen's actions had led to changes in Government procedures. Accordingly, Jeppesen had both the ability to detect an error and a mechanism for seeking corrections. Under these circumstances, we reject Jeppesen's argument that the Government's procedure was completely beyond Jeppesen's control.

■ More fundamentally, however, existing products liability law is contrary to Jeppesen's position. Assuming that the Government's instrument approach procedure was defective, the literal requirements of section 402A are met. Jeppesen's chart was a "product in a defective condition unreasonably dangerous to the user" within the meaning of section 402A(1). Section 402A(2)(a) provides that strict liability is appropriate even though "the seller has exercised all possible care in the preparation and sale of his product." A seller is strictly liable for injuries caused by a defective product even though the defect originated from a component part manufactured by another party. *E.g., Vandermark v. Ford Motor Co.,* 61 Cal.2d 256, 262, 391 P.2d 168, 170, 37 Cal.Rptr. 896, 898 (1964); *see Prosser and Keeton on the Law of Torts* § 100, at 705 (W. Keeton 5th ed. 1984). Accordingly, the appropriate focus of inquiry is not whether Jeppesen caused the product to be defective, but whether the product was in fact defective. *See Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 377 P.2d 897, 900, 27 Cal.Rptr. 697, 700 (1963).

The concept of fault has persisted in substantive products liability law primarily in determining whether a defective product is "unreasonably dangerous." *See* Powers, *supra,* at 781–97. We note that the California courts have sought to purge the concept of fault from strict liability law by focusing on the existence of a defect, rather than inquiring whether the product is

---

**10.** Jeppesen's position resembles the "contract specifications" defense. Under the contract specifications defense, a manufacturer cannot be held liable for producing a product in accordance with specifications that are beyond its control. *See* Note, *Liability of a Manufacturer for Products Defectively Designed by the Government,* 23 B.C.L.Rev. 1025, 1032–48 (1982). The California courts have rejected the application of this defense to strict liability claims. *Rawlings v. D.M. Oliver, Inc.,* 97 Cal.App.3d 890, 896–97, 159 Cal.Rptr. 119, 121–22 (1979); *accord Challoner v. Day & Zimmermann, Inc.,* 512 F.2d 77, 82–83 (5th Cir.), *vacated on other grounds,* 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975); *see* Note, *supra,* at 1039–43.

unreasonably dangerous. *E.g., Barker v. Lull Engineering Co.,* 20 Cal.3d 413, 422–26, 573 P.2d 443, 449–52, 143 Cal.Rptr. 225, 231–34 (1978); *Cronin v. J.B.E. Olson Corp.,* 8 Cal.3d 121, 127–35, 501 P.2d 1153, 1158–63, 104 Cal.Rptr. 433, 438–43 (1972). To the extent that Jeppesen's product was defective, the case law does not support an attempt to relieve Jeppesen of liability on the ground that the defect was not Jeppesen's fault. Comment *c* to section 402A of the *Restatement (Second) of Torts* states the policies underlying strict products liability as follows:

> [T]he justification for strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper person to afford it are those who market the product.

*See also Escola v. Coca-Cola Bottling Co.,* 24 Cal.2d 453, 150 P.2d 436, 440–44 (1944) (Traynor, J., concurring). All of those policies apply to the plaintiffs' claim in this case. To the extent that Jeppesen is held liable for the Government's misfeasance, Jeppesen had a right to seek tort law indemnification.[11] The fact that Jeppesen failed to seek tort law indemnification has no bearing on the plaintiffs' substantive rights.

---

**11.** *Lockheed Aircraft Corp. v. United States,* 460 U.S. 190, 198, 103 S.Ct. 1033, 1038, 74 L.Ed.2d 911 (1983); *see* 28 U.S.C. § 2674. Of course, the

### c. *Sufficiency of the Evidence*

■ Jeppesen contends that the evidence presented at trial did not prove that the chart was defective. The plaintiffs produced evidence regarding several alleged defects. One of the alleged defects was the absence of a transition arc. Jeppesen's only response to that allegation is that it had no power to alter the Government's procedure. As noted above, that is not a valid defense. Accordingly, we conclude that the plaintiffs introduced sufficient evidence to support a finding that the chart was defective.

### 2. *Negligence*

■ Jeppesen contends that it cannot be held liable for negligence on the facts presented at trial. The district court instructed the jury as follows:

> Now, one who supplies a product, either directly or through a third person, for another to use, which the supplier knows or has reason to know is dangerous or is likely to be dangerous for the use for which it is supplied, has a duty to use reasonable care to give warning of the dangerous condition of the product or of facts which make it likely to be dangerous to those whom he should expect to use the product or be endangered by its probable use if the supplier has reason to believe that they will not realize its dangerous condition. A failure to fulfill that duty is negligence. This rule applies to a producer of a product.

> The producer of a product that is reasonably certain to be dangerous if negligently made, has a duty to exercise reasonable care in the design, production, testing and inspection of the product and in the testing and inspection of any component parts made by another so that the product may be safely used in a manner and for a purpose for which it was made.

> A failure to fulfill that duty is negligence.

Government is not subject to strict liability in tort. *E.g., Petty v. United States,* 679 F.2d 719, 726 (8th Cir.1982).

The district court's instructions correctly stated the law.[12] In light of Jeppesen's internal operating procedures, which required testing for completeness, and its failure to detect the defects in the instrument approach procedure, the jury could reasonably have found that Jeppesen was negligent in failing to warn users of the latent defects in the chart.

Jeppesen argues that it had no ability to change the procedure and that it had no duty to control the actions of the Government. Both arguments miss the point. The negligence theory was submitted to the jury on a "duty to test/duty to warn" theory, rather than on a "duty to control the Government" theory. Jeppesen can be held liable for negligently failing to detect the defect in the product that it marketed. If it had discovered the defect, Jeppesen would have been required either to warn the users of the chart or to refrain from selling the product.

### 3. *Public Policy Defenses*

Jeppesen asserts a first amendment privilege against liability based on commercial speech. Even assuming that this case involves commercial speech, however, it is well established that commercial speech is subject to many forms of regulation. *E.g., Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 455–56, 98 S.Ct. 1912, 1918–19, 56 L.Ed.2d 444 (1978); *see* Faber, *Commercial Speech and First Amendment Theory*, 74 Nw.U.L.Rev. 372 (1979). The public may be protected from false or misleading commercial messages. *See Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980). Requiring a chart manufacturer to produce a safe product would have no significant chilling effect on freedom of speech. Accordingly, Jeppesen's tortious conduct was not privileged. *See Weirum v. RKO General, Inc.*, 15 Cal.3d 40, 48, 539 P.2d 36, 40, 123 Cal.Rptr. 468, 472 (1975); *cf.* Note, *Products Liability and the First Amendment: The Liability of Publishers for Failure to Warn*, 59 Ind.L.J. 503 (1984) (discussing the more stringent standards applied to products liability claims against media defendants).

Jeppesen also claims a privilege under Cal.Civ.Code § 47(4). Section 47(4) only applies to reports in a "public journal." Jeppesen's charts are not a public journal.

### C. *Prejudgment Interest*

#### 1. *Right to a Jury Trial*

Jeppesen contends that the district court's award of prejudgment interest to the plaintiffs violated its right to a jury trial. Jeppesen notes that Cal.Civ.Code § 3288 leaves the decision to award prejudgment interest to the jury. The district court, however, based its award on Cal.Civ. Code § 3287(a), which does not require a jury determination. But even if Jeppesen had the right to a jury trial, it waived any objection to the district court's actions by failing to object at trial. The record reveals that Jeppesen has raised this issue for the first time on appeal.

#### 2. *Availability of Prejudgment Interest*

Section 3287(a) provides, in pertinent part: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled to recover interest thereon from that day." The plaintiffs claim that the value of the property damage to the aircraft was "capable of being made certain by calculation." The district

---

**12.** The manufacturer of a potentially hazardous product has a duty to conduct reasonable tests and inspections to detect latent defects. *Putensen v. Clay Adams, Inc.*, 12 Cal.App.3d 1062, 1078, 91 Cal.Rptr. 319, 329 (1970); *see* 1 L. Frumer & M. Friedman, *Products Liability* § 6.01[1] (1984). The failure of the manufacturer to warn consumers of defects of which the manufacturer is or should be aware constitutes negligence. *Lunghi v. Clark Equipment Co.*, 153 Cal.App.3d 485, 491–95, 200 Cal.Rptr. 387, 389–92 (1984); *Putensen*, 12 Cal.App.3d at 1076–77, 91 Cal.Rptr. at 328; *see* 1A L. Frumer & M. Friedman, *supra*, § 8.01.

court agreed and awarded prejudgment interest.

In order for damages to be "certain," it is not necessary that they be liquidated. All that is required is established or reasonably ascertainable market prices or values for the property destroyed. *Lineman v. Schmid*, 32 Cal.2d 204, 212, 195 P.2d 408, 413 (1948). The fact that the plaintiff prays for an amount in excess of the actual award does not render damages uncertain. *Ferro v. Citizens National Trust & Savings Bank*, 44 Cal.2d 401, 415–16, 282 P.2d 849, 857 (1955); *National Farm Workers Service Center, Inc. v. Caratan*, 146 Cal.App.3d 796, 811, 194 Cal. Rptr. 617, 627 (1983).

In this case, the damages related to the destruction of the aircraft consist of four components: (1) the base value of the aircraft, (2) the value of a spare parts kit and other material aboard the aircraft, (3) the cost of recovering the remains of those aboard the aircraft, and (4) the value of various specific features or "extras" on board the aircraft. The value of the first, second, and third components is undisputed. The experts disagreed only on the value of the fourth component. Thus, the following damages were undisputed:

| | |
|---|---|
| Destruction of the aircraft | $9,000,000 |
| Spare parts kit, etc. | 253,420 |
| Expenses to recover remains | 27,575 |
| Total | $9,280,995 |

The jury awarded $9.3 million, which was only $19,005 more than the undisputed total. $9.3 million is also the figure suggested by Jeppesen's counsel in closing argument.

We agree with the district court's conclusion that the damages were certain. The mere fact that the amount of damages was in dispute is not dispositive. *Esgro Central, Inc. v. General Insurance Co.*, 20 Cal.App.3d 1054, 1062–63, 98 Cal.Rptr. 153, 158 (1971). The only disputed issue was the value of the "extras." Even though the jury evidently rejected the plaintiffs' contentions regarding the "extras," the remaining components had reasonably ascertainable market values. Accordingly, the damages were sufficiently certain to justify an award of prejudgment interest. *See Caratan*, 146 Cal.App.3d at 811, 194 Cal. Rptr. at 857.

### III

### CONCLUSION

The judgment of the district court is AFFIRMED.[13]

---

13. Jeppesen's motion to strike portions of the excerpts of record is denied.