**JEPPESEN SANDERSON, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 11–87C.**

United States Claims Court.

Oct. 19, 1990.

Gregory C. Read, San Francisco, Cal., for plaintiff. Nicholas W. Heldt and Sedgwick, Detert, Moran & Arnold, San Francisco, Cal., of counsel.

Gary W. Allen, Vienna, Va., with whom was Asst. Atty. Gen. Stuart M. Gerson, Washington, D.C., for defendant.

## OPINION

FUTEY, Judge.

In this stage of the case the court is asked to decide two questions briefed by the parties. Jeppesen seeks to recover from the government the full amount of a tort judgment rendered against it by the district court for the Northern District of California. Jeppesen bases its claim upon an indemnity agreement, by which the government agreed to indemnify Jeppesen for that portion of the judgment which was determined by the jury or the district court to be established upon Jeppesen's publication of government data. Jeppesen argues that the jury held it liable because the Federal Aviation Administration's (FAA) design of the instrument approach proce-

dure was a proximate cause of the accident. Defendant disputes that the jury made this finding. In addition, defendant argues that the exclusion provisions of the indemnity agreement bar recovery because of Jeppesen's failure to include altitude restrictions on the chart.

### Factual Background
#### A. Case and Flight History

This case is before the court pursuant to a decision by the Court of Appeals for the Federal Circuit, rendered February 6, 1989, directing this court to determine that portion, if any, of indemnification that Jeppesen is entitled to under an agreement with defendant. *Jeppesen Sanderson, Inc. v. United States*, 868 F.2d 1277 (Fed.Cir. 1989). In addition, this case has been the subject of two prior opinions by the court. On April 19, 1988, this court granted defendant's motion for summary judgment. *Jeppesen Sanderson, Inc. v. United States*, 14 Cl.Ct. 624 (1988). On January 10, 1990, this court denied plaintiff's motion for summary judgment based on post-trial jury affidavits. *Jeppesen Sanderson, Inc. v. United States*, 19 Cl.Ct. 233 (1990). A full statement of the facts can be gleaned from a reading of these prior opinions. Consequently, the facts will be supplemented and elaborated here only where appropriate.

On September 8, 1973, a World Airways cargo aircraft 802 (World 802), using Jeppesen's chart in instrument weather conditions,[1] crashed into Mt. Dutton near Cold Bay, Alaska. The aircraft made contact with the Air Traffic Control at 5:25 a.m. Pacific Standard Time, about 15 minutes before it crashed, and reported that it was at 31,000 feet and 125 miles from the flight service station at Anchorage, Alaska. Two minutes later, the flight service station gave it an approach clearance as follows: "ATC clears World 802 for an approach to Cold Bay Airport." This clearance authorized the pilot to execute any one of the

---

**1.** The weather conditions at Cold Bay required the aircraft to fly in instrument meteorological conditions. In this mode, the crew must navigate solely by reference to aircraft instruments.

Only one approach procedure was designated by the FAA and that was the one depicted on Jeppesen's chart.

authorized instrument approach procedures for the airport. At this point, the aircraft began to descend continuously until it leveled off at 3,500 feet about 35 miles from the airport. The aircraft crashed at this altitude into the side of Mt. Dutton, which has a peak elevation of about 4,961 feet and is located a little more than 19 miles from the airport. All six individuals aboard the aircraft were killed, and the aircraft was destroyed. World Airways and the heirs of the individuals who were killed in the crash instituted tort actions against both Jeppesen and the government.[2]

Prior to trial, the two defendants entered into a "stipulation of compromise settlement" which provided, *inter alia*, that Jeppesen relinquished any right it might have to proceed against the government for indemnity or contribution in exchange for an undertaking by the government to indemnify Jeppesen for that part of any judgment covered pursuant to ¶ 8 of the agreement.[3]

The parties subsequently agreed, pursuant to ¶ 10 of the agreement, on special interrogatories to be submitted to the jury in order to fulfill the condition of the compromise settlement. However, the trial judge decided that since neither defendant had filed a cross claim, the indemnification question was not before that court and thus, the interrogatories should not be submitted to the jury, nor should he decide the question himself.

On June 27, 1983, after a 49 day trial, the jury rendered a general verdict against Jeppesen in the total amount of $11,630,000.00. At the close of trial the judge suggested possible alternatives for handling the indemnity issue, but the co-defendants were evidently unable to agree on an alternative procedure. The government then indicated to Jeppesen that it believed the indemnity agreement had become unenforceable and it intended to enter into settlement negotiations with plaintiffs. Afterward the government settled with plaintiffs for 5 million dollars. After adding prejudgment interest, and crediting the government's settlement, the final judgment against Jeppesen was $12,785,580.81. That amount, plus post-judgment interest, was paid by Jeppesen in 1985.

### B. *Flight Procedure and Alaska Supplement*

Pursuant to 14 C.F.R. § 97, the FAA designs instrument approach procedures for use by pilots landing at an airport when they have no visual reference to the ground and must depend upon instruments for navigation. The FAA's approach procedures are described in tabular form on FAA Form 8260–5. This standard FAA form is completed by FAA approach procedure specialists who develop the courses, minimum altitudes, and other necessary data to describe the procedure in accordance with 14 C.F.R. § 97. The data are then utilized by both governmental and private chart makers to design pictorial procedure charts which are sold to pilots and operators on a subscription basis. Thus, while the data comprising the procedure are developed by the FAA, the manner in which the data are depicted is left to the discretion and artistry of private cartographers.

In addition to the information contained on Form 8260–5, the FAA publishes a number of other documents which contain information relevant to approach procedures, for example, Notices to Airmen (NOTAMS). The NOTAM at issue was one regarding usability restrictions on the Cold Bay radio navigation aids, specifically the VORTAC,[4] below certain altitudes. This

---

**2.** These actions were consolidated for trial into *Barbara Brocklesby v. Jeppesen & Company,* Action No. C 74–1874–SC in the United States District Court for the Northern District of California. Nevertheless the actions received different treatment. The claim against Jeppesen was decided by a jury. Plaintiff's claim against the government was brought pursuant to the Federal Tort Claims Act. Consequently, it was to be decided by a judge. *See* 28 U.S.C. § 2402 (1988).

**3.** This paragraph is the main subject of this Opinion.

**4.** VORTAC is a navigational aid. It uses ground-based electronic navigation signals, 360 degrees in azimuth. These are similar to the

NOTAM was published by the government in a document known as the Alaska Supplement and was in effect at the time of the accident. The NOTAM explicitly warned pilots that the Cold Bay VORTAC's navigation signal could not be intercepted in the vicinity of the initial approach fix [5] beyond 40 nautical miles (DME) [6] from the airport at an altitude of less than 5,500 feet. In addition, the Alaska Supplement warns that the VORTAC is unusable below certain other altitudes in certain other zones.

This is a case involving mistaken zones and locations. At trial, evidence was submitted that the aircraft crew must have believed that the aircraft was at a radial of 113–14 degrees, rather than at its actual location on the 087 degree radial, where the VORTAC restriction is 9,000 feet beyond 40 DME. In contrast, the usability restriction between 110 and 160 degrees is 5,500 feet. Consequently, the VORTAC signals received by the aircraft presumably were erroneous.

Two theories were presented to the jury as to how the plane found itself in a mistaken location. Plaintiff argued that there was an inaccurate VORTAC signal broadcasted from the government's ground navigational facilities. In addition, plaintiff alleged that an equipment malfunction on the ground in the government's navigational equipment was transmitting inaccurate data. In response, the government and Jeppesen contended that the approach procedure could not be a proximate cause, because the aircraft had never traversed the area covered by the procedure. These parties argued that there was either pilot error in interpreting the signals or equipment malfunction inside the aircraft.

Furthermore, although it is undisputed by all parties that World 802 never reached any part of the approach procedure de-signed by FAA, plaintiffs advocated, as a second theory, that the approach procedure developed by the government should have a transition arc with a minimum altitude. In other words, plaintiffs contended that if the approach procedure had required the pilot to remain above 8,000 feet at the place the pilot thought the aircraft was located, the aircraft would not have crashed into Mt. Dutton. According to plaintiffs, such a procedure would have helped the crew recognize its predicament and allow the crew more time to discover and correct this situation. Consequently, plaintiffs reasoned that there should have been a such transition arc so that the aircraft would have been required to stay at 8,000 feet no matter where it was until it situated itself on the approach procedure. Similarly, the government submitted evidence that an altitude restriction, which would have also kept the aircraft at the necessary height, was negligently missing from the chart, due to Jeppesen's fault.

The jury was instructed that they could find the crew contributorily negligent if they had committed an error in an interpretation of the data or if there was an aircraft equipment malfunction. The jury found no contributory negligence and awarded a general verdict.

Prior to the trial of the tort action, the government and Jeppesen entered into a "stipulation of compromise settlement," which provided, *inter alia*, pursuant to ¶ 10 of the agreement, that special interrogatories were to be submitted to the jury in order to determine what portion or percentage of any judgment against Jeppesen was subject to indemnity in accordance with ¶ 8. However, the district court refused to submit the interrogatories to the

spokes of a wheel. It is used for navigation in the National Airspace System.

5. The initial approach fix is the beginning of the approach to the landing area. On a chart, it is represented by a straight line. "Situating itself on the approach" means the aircraft has lined itself up with the localizer beam, which is a beam that comes out directionally from the center line of the airstrip.

6. DME stands for distance measuring equipment and is used to measure, in nautical miles, the slant range distance of an aircraft from the DME navigational aid (in this case the TACAN). A "DME arc" is the track over the ground of an aircraft flying at a constant distance from a DME navigational aid.

jury, and declined to make the determinations itself.

Jeppesen appealed, and the United States Court of Appeals for the Ninth Circuit affirmed the decision of the district court. It held, among other things, that the district court's refusal to submit special interrogatories to the jury or to enforce the indemnity agreement was not an abuse of discretion. *Brocklesby v. United States*, 767 F.2d 1288 (9th Cir.1985), *cert. denied, Jeppesen & Co. v. Brocklesby*, 474 U.S. 1101, 106 S.Ct. 882, 88 L.Ed.2d 918 (1986). In addition, it concluded that the district court did not have jurisdiction over the indemnity agreement since the claim against the United States exceeded $10,000.00. *Id.*

Plaintiff filed its complaint in this court on January 12, 1987. On April 19, 1988, this court granted the government's motion for summary judgment on the grounds that the failure of the jury in the district court action to make a finding as to the basis of its verdict released the government from any obligation under the indemnity agreement. *Jeppesen Sanderson, Inc. v. United States*, 14 Cl.Ct. 624 (1988).

Jeppesen appealed the judgment of this court to the United States Court of Appeals for the Federal Circuit. By decision rendered February 6, 1989, the Federal Circuit Court vacated that judgment and remanded the case to this court "to determine that portion, if any, of the [district court] judgment for which Jeppesen must be indemnified." *Jeppesen Sanderson, Inc. v. United States*, 868 F.2d 1277 (Fed.Cir.1989).

On January 10, 1990, this court denied plaintiff's motion for summary judgment based on post-trial jury affidavits. *Jeppesen Sanderson, Inc. v. United States*, 19 Cl.Ct. 233 (1990).

■ The court held a status conference on February 15, 1990. The parties discussed the possibility of bifurcation of the trial; the first phase would ascertain liability under the agreement; and the second phase would determine apportionment. Pursuant to the court's Order, the parties filed a Joint Status Report on February 20, 1990, which contained the following questions to be answered by the court in this first phase:

1. Did the trial jury hold Jeppesen liable because it found the FAA's design of the subject instrument approach procedure was a proximate cause of the accident?

Plaintiff has the burden of proof on this issue under the "preponderance of the evidence" standard. *See Cooper v. Mitchell Bros.*, 454 U.S. 90, 93, 102 S.Ct. 172, 173, 70 L.Ed.2d 262 (1981).

2. Did the trial jury hold Jeppesen liable because it found that any of the reasons specified in subparagraphs (a) through (d) of paragraph 9 of the contract was a proximate cause of the accident?

The parties have briefed the issue of the burden of proof on question 2. The court finds that the government bears the burden to prove, under a "preponderance of the evidence" standard, that the trial jury made any of these findings. *Javierre v. Central Altagracia*, 217 U.S. 502, 508, 30 S.Ct. 598, 599, 54 L.Ed. 859 (1910); *see Pocono Pines Assembly Hotels Co. v. United States*, 69 Ct.Cl. 91 (1930).

The Joint Status Report further provided:

> The parties agree that the only evidence to be considered by the court in answering these two questions is the evidence submitted at the underlying trial in the United States District Court for the Northern District of California, including the entire trial transcript and exhibits which were admitted in evidence.

> \* \* \* \* \* \*

> The parties agree if the court finds from the evidence that the answer to the first question is yes, and the answer to the second question is no, then Jeppesen is entitled to 100% indemnity. The parties further agree that if the Court finds from the evidence that the answer to the first question is no, then plaintiff would not be entitled to recover any sum from defendant.

The court's duty pursuant to the Federal Circuit's mandate is narrow. Like an arbitrator, the court has the limited role of ascertaining liability between the parties

and appropriating such liability if comparative fault is shown.

## Discussion

### I. *Approach Procedure as a Proximate Cause*

■ The indemnity agreement provides at ¶ 8 that the government will indemnify Jeppesen for:

> [T]hat portion of percentage of any final judgment rendered against Jeppesen ∴ . because it was the publisher, seller, or distributor of an approach chart portraying *said instrument approach procedure, if the design of that procedure by the FAA as described on Form 8260–5 is found by the trier of fact to be a proximate cause of the accident* [.] [Emphasis added.]

As a threshold matter, the court must consider whether, under the agreement, the instrument approach procedure includes the flight area beyond 40 DME. The approach procedure, designed by the FAA and represented by Jeppesen, is limited to 40 DME. It is undisputed by all parties that World 802 never reached any part of it. Nevertheless, Jeppesen was found liable and yet Jeppesen's chart, which describes the procedure, is the sole basis for its liability. In addition, the jury found that the plane was lost before it arrived at 40 DME. As stated earlier, this court is bound by any determinations of fact made by the jury. Consequently, since the jury found Jeppesen liable, the procedure is not limited to the language of 8260–5; it includes the flight activities beyond 40 DME.

In addition, it is worth noting at the outset that Jeppesen asserts that the theory of liability selected by the jury is inconsequential; the critical inquiry is whether Jeppesen was held liable because the jury found the design of the approach procedure to be a proximate cause of the crash. In response, the government argues that the jury found Jeppesen solely liable under a negligence theory. However, a plain reading of the agreement indicates that Jeppesen may be entitled to a degree of indemnity, even if its own actions were found by the jury to be an independent cause of the accident. Consequently, the contentions of the parties on this point are devoid of merit.[7] Furthermore, since the procedure is defined by the jury to include areas beyond the 40 DME, Jeppesen cannot receive absolute indemnity under a strict liability theory, by claiming that it merely published the chart.

At trial, the plaintiffs contended that the procedure was deficient because it did not have a DME arc or other transition route with appropriate altitude restrictions (such as 8000 feet). Plaintiffs further contended that the procedure did not have an initial approach fix consistent with the VORTAC facility restrictions.

In response, the government now avers that "[f]rom evidence submitted at trial . . . a reasonable fact finder could not conclude that this invariably tied this allegation of a lack of an arc to the crash." Defendant points out the testimony at trial regarding the elective nature of arcs. Nevertheless, it is not the court's duty here to conduct a

---

7. Defendant asserts that:
   > And so when Jeppesen argues now that everything they did, in failing to check the Alaska supplement, in failing to determine whether these were pertinent for the instrument approach procedure chart and its failing to include it, that all of that should be included within the indemnity agreement, that files in the face of reason.

   [Transcript of oral argument, September 19, 1990 (Tr.) pp. 65–66.]

   In essence, defendant argues that it did not agree to indemnify Jeppesen's own negligence. However, the court notes provision of ¶ 8:
   > This indemnity agreement applies to any such judgment, or portion thereof, rendered against Jeppesen under the conditions described above, whether based upon a theory of negligence, strict liability or breach of warranty.

   Jeppesen reads the agreement as allowing indemnification even if it was negligent so long as its liability is based on a finding that the design of the approach procedure was a proximate cause of the accident.

   In contrast to these assertions, the court finds that Jeppesen's independent negligence liability goes to the degree of comparative fault, rather than an absolute right or denial of indemnification as these parties' assertions suggest.

*de novo* trial of the case; we are limited to the facts and theories before the jury.

In this case, there was substantial evidence that the approach procedure itself was defective because it lacked a transition arc and that this deficiency was a proximate cause of the accident. In essence, the jury found that if there had been an arc on the procedure, then the accident would not have occurred. There was testimony that the FAA employee, Donald Christiansen, who designed the back course procedure, originally included a 40 DME arc with an 8,000 foot altitude restriction in the procedure. However, the arc was deleted by a superior before the procedure was published (Transcript (tr.) of trial proceedings [8] at 944:25–946:1; 947:13–949:8; 953:23–954:23; 959:16–960:24; 961:13–963:12; 967:14–24; 969:13–25; 1031:20–1032:1; 1042:14–18; 1044:25–1047:1 (Christiansen's). 1177:3–1178:5; 1187:11–18 (Turner's)). Plaintiffs contended that such an arc would have kept the aircraft 40 miles away from the VORTAC at 8,000 feet and substantially above 4,961 Mt. Dutton. (Christiansen 972:1–974:2; 1040:1–13; 1041:13–16; 1079:2–25; Turner 1639:7–1640:17). The testimony of Christiansen supports this:

Q: The arc was there to help the pilot get to the 40 D.M.E. Fix at a safe altitude and a safe distance away from terrain, Right?

A: That was the original intent, yes. I should modify that. The arc would have provided safe altitude and reception. The purpose of the arc was to try and tie the en route structure to the initial approach fix. It was a new concept at that time.

[1041:13–20]

In addition, the FAA re-designed the procedure to include a 30 DME with a 9,000 foot altitude restriction, subsequent to the accident. (Turner 1250:25–1252:13; 1254:1–16; Christiansen 1370:23–1373:3).

At trial, after identifying the shortcomings of the FAA's design of the approach procedure, each expert testified that the design was a proximate cause of the accident. McDermott testified:

Q. ... The cause of this crash?

\*   \*   \*   \*   \*   \*

A. That the approach plate failed to provide the transition altitude in the form of a feeder or an arc which would allow the aircraft to safely transition from the en route and descent phase to the details of this particular procedure. *And such a feeder or arc would be accompanied with an altitude restriction below which the aircraft would not fly until it had completed the transition.*

[Emphasis added; McDermott 704:16–705:2; *see also* Kari 2484:25–2485:25; Healy 3554:25–3555:8.]

Captain Kenneth Healy, plaintiffs' pilot expert, testified:

Q. Putting aside the fact that the chart does not have an arc on it, aside from that, do you agree that there is nothing about Jeppesen's localizer DME back course instrument approach chart ... which caused or contributed to causing this accident?

A. No, within the limits of a few very minor changes, I—I can agree that what is there is okay.

[3892:12–18.]

Furthermore, Healy testified concerning Jeppesen's chart and the absence of a transition and altitude restriction:

A. It's a good chart. It's just incomplete.

Q. It's incomplete because it's missing a transition?

A. And the altitude.

Q. That would be part of the transition, right?

---

8. The parties have submitted a joint trial appendix which contains excerpts from the district court trial. The trial transcript has a typewritten number on each page that was superseded by new and different stamped numbers. These are located at the bottom right hand side of each page. The reference numbers in this Opinion refer to these new numbers and their respective line indexes.

A. Yes.

[3893:16–20]

In light of the testimony of Christiansen, Turner, McDermott, Kari and Healy, the court concludes that Jeppesen has at least met its burden of proof and has shown that the jury found that the approach procedure was a proximate cause of the accident.

## II. *Absence of Usability Restriction as a Proximate Cause*

■ Having answered the first question in the affirmative, the court now focuses on whether Jeppesen failed to include something above and beyond the approach procedure that should have been included on its chart. If so, then there would be an additional proximate cause of the accident. The agreement at ¶ 9 provides: [9]

> The United States will not indemnify Jeppesen for that portion or percentage of any judgment rendered against Jeppesen because the jury finds that one or more of the following was a proximate cause of the accident:
>
> \*　\*　\*　\*　\*　\*
>
> d. Jeppesen's inclusion, or failure to include, any information on its instrument

approach chart which was not published as a part of the instrument approach procedure, including transitions thereto, on said Form 8260–5.

Defendant argues that Jeppesen was found liable under ¶ 9D because of its failure to include on its chart the VORTAC usability restriction as stated in the Alaska Supplement. Defendant contends that the accident occurred because the crew was unaware of the usability restriction below 9,000 feet, not 5,500 feet as asserted by Jeppesen.[10]

However, Jeppesen asserts otherwise; it argues that even if it was a "shortcoming" in not putting the usability restriction directly on its chart, that omission has no approximate relationship to the accident; there was no evidence that the jury concluded it was a proximate cause of the crash. According to Jeppesen, the evidence was to the contrary, that the aircraft knew of the restriction, complied with the restriction and was above 5,500 feet at all times when it was beyond 40 DME. At oral argument, plaintiff's counsel firmly stated: "The pilot has the duty to consult the Alaska Supplement. It is his responsi-

---

**9.** The agreement contains four exculpatory provisions, subparagraphs a through d. These are described by Jeppesen at oral argument:

> Now the contract also recognized that there were other theories against Jeppesen that the Plaintiff was urging and that the parties agreed would not be the responsibility of the government. And those theories are outlined in paragraph 9.

[Tr. pp. 18–19]

The court has reviewed the applicability of each of them. Subparagraph d is the only one of merit and the only one seriously contended and contested by the parties. At oral argument, Jeppesen describes the mechanism of liability in this subparagraph:

> And the government contends and the Plaintiffs in the District Court contended that Jeppesen's failure to include a note concerning the VORTAC usability restriction on its approach chart would be the kind of liability that Jeppesen could incur that would not be the subject of indemnity by the government.

[Tr. p. 21.]

Jeppesen continues:

> If the jury had held Jeppesen liable because Jeppesen did not provide the aircraft with data concerning the usability restriction of the VORTAC and that failure by Jeppesen to

provide that data was a [sic] proximate cause of the crash, then the government would not be required to indemnify Jeppesen for that.

[Tr. p. 21.]

The court finds Jeppesen's understanding of the mechanism of liability under these provisions to be correct.

**10.** Jeppesen, focusing only on the period when the aircraft was near or at 40 DME, mischaracterizes defendant's argument:

> [T]here is no way that the jury could have decided that the failure to put this 5500 foot option restriction on the chart was a [sic] proximate cause of the crash because all the testimony the pilot had it on board, the Alaska Supplement, he read it, he relied on it he complied with it, he was above 5500 feet at all times when he was beyond 40 miles.

[Tr. p. 79.]

Jeppesen stresses the time period when the aircraft reached 40 DME while defendant emphasizes the time before it arrived at that point. Both periods were before the jury.

The court finds that the time that the flight was beyond 40 DME especially relevant. The jury had to find that the aircraft was lost before it reached 40 DME in order to find the arc as being useful.

bility to do so. That was the testimony of the experts. And he, in fact, did."

Nevertheless, in order to clarify what the jury actually found, it is helpful to ask: Which party is responsible for allowing the initial navigational problem? This case is an inquiry into "primary responsibility" and "secondary responsibility" [11] for the accident. "Primary responsibility" concerns the plane venturing off course before reaching 40 DME. "Secondary responsibility", which is already established under Part I of this Opinion, refers to the last chance to prevent the accident.

"Primary responsibility" requires attention to the time period before the aircraft reached 40 DME. First, it is worth noting that the jury found that the arc would have prevented the accident.[12] Nevertheless, the crew had to be lost before 40 DME for the arc to have made any difference. Thus, it is critical to note when the crew relied on the chart. The jury found that by the time that the crew looked at the Alaska Supplement, the crew was lost. This is true because the jury's findings concerning the other parties's responsibilities allow no other conclusion. The government was accountable for providing the Alaska Supplement, and, as determined above, the arc. However, that is the extent of the government's responsibilities. The absence of the arc does not explain why the plane was originally lost. In addition, the jury found no contributory negligence with the pilots; they read the VORTAC signals correctly and relied on the supplement. The only other explanation before the jury, supported by substantial evidence, was Jeppesen's failure to place the usability restriction.

Plaintiffs' elicited testimony from Mr. Wayne Rosenkrans, president of Jeppesen, regarding Jeppesen's extensive internal procedures for ascertaining the accuracy and completeness of both the government's procedures and Jeppesen's graphic portrayals of those procedures. According to the

trial testimony, Jeppesen's employees are directed by the production specifications manual to check the consistency, completeness and accuracy of the data supplied by the FAA concerning the instrument approach procedure. [2833:13–2840:25; 2851:6–2854:9]. This requirement applied to both construction and composition of the charts. Yet in this case, Rosenkrans testified that Jeppesen did not contact the government about any concerns it might have had regarding the procedure. He also stated that Jeppesen didn't check the Alaska Supplement to ascertain if the government had established any facility restriction which could be relevant to the chart.

Q: You are saying now that Jeppesen has not, and didn't in this case, check the instrument approach procedure against the facility restrictions as to the usability of navigational signals at Cold Bay?

A: That is correct.

[2431:19–23.]

On this issue the Ninth Circuit held that "Jeppesen had both the ability to detect an error and a mechanism for seeking corrections. Under these circumstances, we reject Jeppesen's argument that the Government's procedure was completely beyond Jeppesen's control." *Brocklesby*, 767 F.2d at 1296.

In addition, as mentioned earlier, plaintiff's expert, Captain Healy, when asked about Jeppesen's chart, testified that it was good, but incomplete. [3462:4–16.] In response to the question of whether he had any trouble understanding the depictions on Jeppesen's chart, Captain Healy testified:

A. No, No, the one other thing on there that I see that bothers me a little bit is the 3500–foot altitude out at the 40 D.M.E., which is below the minimum reception altitude given in the Alaska sup-

---

**11.** The terms "primary responsibility" and "secondary responsibility" do not refer to any comparative degree of fault between the parties; they illustrate the sequence of events.

**12.** Consequently, the jury found that the government had "secondary responsibility" for the accident.

plement, but that ties in again with the arc and the transition.

[3893:4–8.]

As determined by the jury, when the aircraft commenced its descent, the crew first examined the Jeppesen' chart, which had no altitude restrictions. Soon after, they were flying too low. The VORTAC signals they received were erroneous probably due to interference caused by the mountains. At some point thereafter, they realized the absence of restrictions. Then they read the Alaska Supplement. They tried to correct their altitude and be in accord with their assumed position, but by that time, as they approached 40 DME, they were lost. Subsequently, the plane crashed.

Jeppesen's negligence as an independent cause of the accident was important and substantial.[13] This court concludes that the government's burden of proof has been met and that the jury found that a proximate cause of the accident was Jeppesen's failure to put a VORTAC usability restriction on the chart. Even recognizing that the jury found that the flight crew had the Alaska Supplement aboard, looked at it, and relied on it during the final flight, the court is persuaded that the jury found that by the time the crew looked at the Alaska Supplement, they were lost. Consequently, both the absence of an arc and an altitude restriction on the chart are proximate causes supported by substantial evidence. This case becomes one of comparative fault.[14]

*Conclusion*

Both issues presented to the court are answered in the affirmative. The parties are ordered to file with the court within 90 days, pursuant to RUSCC 42(c), using appropriate experts, a finding as to comparative fault in accordance with this Opinion.

---

13. Jeppesen's catalog describes their charts as follows:

When pilots compare approach plates ... for information, for readability ... they choose Jeppesen. Why? Because the format of Jeppesen charts was designed by pilots, for pilots, and has been time-tested and proven by instrument pilots throughout the world. Every necessary detail is clearly indicated. Information is located in one place to eliminate the necessity of searching through several sources.

Jeppesen approach plates include: Plan view and profile view of approach; Minimum Descent Altitude (MDA) and Decision Height (DH); time to missed approach point; initial fixes, pertinent obstructions, airport diagrams, communications and NAV frequencies; airport elevation ... EVERYTHING you need for a smooth transition from enroute to approach segment of your flight.

Wherever you find a published approach, you'll know there is a current Jeppesen approach plate to cover it and weekly revisions to keep the information current.

14. It is this court's determination that the jury found that there were two proximate causes of the accident. Furthermore, the court notes that either one, corrected, would have prevented the accident. Incidently, the comparative degree of fault between the parties is an issue requiring expert testimony and is beyond the scope of the court's attention at this time.