[Civ. No. 64134. Second Dist., Div. Two. July 23, 1985.]

FLUOR CORPORATION, Plaintiff and Appellant, v.
JEPPESEN & COMPANY, Defendant and Respondent.

472

COUNSEL

Tucker & Johnston, William G. Tucker, Michael G. Portner, Patrick L. Johnston and Patricia E. Wright for Plaintiff and Appellant.

La Follette, Johnson, Schroeter & De Haas, Daren T. Johnson, Alfred W. Gerisch, Jr., and Melinda W. Ebelhar for Defendant and Respondent.

OPINION

GATES, J.—Plaintiff Fluor Corporation appeals from the judgment entered in favor of defendant Jeppesen & Company contending "the trial court committed prejudicial error in refusing to instruct the jury upon issues of strict products liability with respect to the Adirondack Airport Approach Chart produced and sold by [respondent Jeppesen]."

The instant litigation stems from the crash of a Lockheed L-1329 Jet Star in the Lake Saranac area of New York on a snowy night in December 1972. While flying at an altitude of approximately 2,140 feet mean sea level (MSL), this plane struck the side of Johnson Hill, located some one and three-quarters miles from Adirondack Airport as its pilot apparently was maneuvering preparatory to attempting a landing. All the occupants were killed and the plane itself was destroyed. Johnson Hill was not designated on the Adirondack Airport instrument-approach chart designed, produced and disseminated by respondent, even though it represented the highest point in the crash area with an elevation of 2,257 feet MSL. Instead a hill with an elevation of only 1,991 feet MSL (Hill 1991), located just 2,400 feet to the southeast of Johnson Hill, was shown.

Appellant, the owner of the Lockheed jet, filed suit against respondent, asserting theories of breach of warranty, negligence and strict products liability. With respect to the latter appellant alleged that the instrument-approach chart for Adirondack Airport was "defective in its design or construction and contained erroneous and misleading information," which defect proximately caused the loss of appellant's plane. By contrast, it was respondent's theory that the accident resulted from the crew's negligence in

descending below federally prescribed minimum altitudes in their attempt to land during adverse weather conditions.

■ No California court has yet decided whether charts of the type manufactured by respondent may be deemed to constitute "products" for purposes of determining the applicability of strict liability principles. However, they were expressly so classified in decisions filed by two different districts of the United States Courts of Appeal after the trial in the instant case had been concluded. (*Brocklesby* v. *United States* (9th Cir. 1985) 753 F.2d 794, 800; *Saloomey* v. *Jeppesen & Co.* (2d Cir. 1983) 707 F.2d 671, 676-677. See also *Aetna Cas. And Sur. Co.* v. *Jeppesen & Co.* (9th Cir. 1981) 642 F.2d 339, 342-343.) The court in *Saloomey* declared in relevant part: "[Jeppesen's] position that its navigational charts provide no more than a service ignores the mass-production aspect of the charts. Though a 'product' may not include mere provision of architectural design plans or any similar form of data supplied under individually-tailored service arrangements, [citation], the mass production and marketing of these charts requires Jeppesen to bear the costs of accidents that are proximately caused by defects in the charts. [Citations.]" (707 F.2d 671, 677.)[1]

The *Brocklesby* court concurred in this analysis and rejected Jeppesen's suggestion that the liability of navigational chartmakers should be determined by those federal cases which "stand for the proposition that books and magazines are not rendered defective by their contents." (753 F.2d 794, 800, fn. 9.)

These holdings are entirely consistent with the fundamental policies which underlie the strict products liability doctrine in this state. As pointed out in *Pike* v. *Frank G. Hough Co.* (1970) 2 Cal.3d 465 [85 Cal.Rptr. 629, 467 P.2d 229]: "California has pioneered in the development and extension of the theory that manufacturers are strictly liable in tort for injuries to persons caused by defects in their products. (See *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 461-468 . . ., concurring opinion by Traynor, J.) In our landmark opinion in *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 . . ., we held that '[a] manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being.' . . ." (*Id.*, at pp. 474-475.)

■ In this manner our highest court has sought to relieve plaintiffs from the problems of proof inherent in pursuing negligence and warranty reme-

---

[1]Respondent produces approximately 8,000 to 9,000 charts worldwide, of which about 5,000 are published for some 2,500 airports in the United States. These charts are available "to all users of the air space" without limitation on their distribution or sale.

dies, and thereby "to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]; *Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 133 [104 Cal.Rptr. 433, 501 P.2d 1153].)

In furtherance of this goal, the defect or defectiveness concept has been expanded to embrace a great variety of injury-producing deficiencies, ranging from products that cause injury because they deviate from the manufacturer's intended result to products which, though "perfectly" manufactured, are unsafe because of the absence of a safety device, and including products that are dangerous because they lack adequate warnings or instructions. (*Campbell* v. *General Motors Corp.* (1982) 32 Cal.3d 112, 120 [184 Cal.Rptr. 891, 649 P.2d 224, 35 A.L.R.4th 1036]; *Cavers* v. *Cushman Motor Sales, Inc.* (1979) 95 Cal.App.3d 338, 343 [157 Cal.Rptr. 142].)

■ We also share the belief expressed by the court in *Lowrie* v. *City of Evanston* (1977) 50 Ill.App.3d 376 [365 N.E.2d 923, 928], "that the policy reasons underlying the strict products liability concept should be considered in determining whether something is a product within the meaning of its use . . . rather than . . . to focus on the dictionary definition of the word." (See also *Kaneko* v. *Hilo Coast Processing* (1982) 65 Hawaii 447 [654 P.2d 343, 349]; Maloney, *Symposium on Products Liability: What is or is not a Product within the Meaning of Section 402A* (1974) 57 Marq. L.Rev. 623.)

■ When so viewed, characterizing respondent's instrument approach charts as "products" serves " '[T]he paramount policy to be promoted by the [doctrine],' " i.e., " 'the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them.' [Citation.]" (*Campbell* v. *General Motors Corp., supra,* 32 Cal.3d 112, 122.)

■ In announcing its refusal to submit the products liability count to the jury in this proceeding, the trial court stated that although it had concluded "the chart in question is a product . . . the principle of strict liability does not apply." It explained that it believed strict liability principles are applicable only to items whose physical properties render them innately dangerous, e.g., mechanical devices, explosives, combustible or flammable materials, etc. This belief was erroneous. (See Rest. 2d Torts, § 402A, coms. b, d; Prosser, *Strict Liability to the Consumer in California* (1966) 18 Hastings L.J. 9, 21-22.)

Respondent's claim that appellant was in some way responsible for this misunderstanding is not supported by the record. In addition, although a sheet of paper might not be dangerous, per se, it would be difficult indeed to conceive of a salable commodity with more inherent lethal potential than an aid to aircraft navigation that, contrary to its own design standards, fails to list the highest land mass immediately surrounding a landing site.

Respondent's production operations manual sets forth various guidelines to be used during the preparation of these charts in order to keep the discretion of their compilers to a minimum. In fact, the president of respondent corporation agreed that this "manual points out to the people who prepare these charts that complete accuracy is required since conditions outside of the cockpit are blind." Further, in order to guide the compilers' selection of topographic features for inclusion on the chart, the manual provides in relevant part: " 'Within reference circle [i.e., an area five miles in radius centered on an airport] show obstruction 50 feet or more above airport elevation.' . . . 'In congested areas precluding charting of all specified high points select and chart *only the highest points.*' " (Italics added.)

■ In its effort to sustain the instant judgment respondent contends that "Even if the Jeppesen Approach Chart is a 'product,' no error was committed by the trial court in failing to instruct on strict products liability where [appellant] failed to present substantial evidence to support the theory." ■ However, it was established in *Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1], that "a product is defective in design either (1) if the product has failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if, in light of [certain] relevant factors . . . the benefits of the challenged design do not outweigh the risk of danger inherent in such design. . . ." (*Id.,* at p. 418; italics in original.)

■ If a plaintiff proceeds under the second prong of *Barker,* he need establish only a prima facie case of causation, i.e., evidence "which would permit a jury to find that a design feature of the product was a proximate cause of plaintiff's injury." (*Campbell* v. *General Motors Corp.,* supra, 32 Cal.3d 112, 119.) Alternatively, if he proceeds under the first prong of *Barker,* "in addition to establishing a prima facie case regarding causation, the plaintiff must also produce evidence that the product failed to satisfy ordinary consumer expectations as to safety. [Citation.]" (*Id.,* at p. 126.)

■ While we do not have a complete record of the entire trial, nonetheless it is clear that neither the trial court nor respondent ever suggested the possibility that the evidence itself was insufficient to support products

liability instructions if, indeed, that doctrine should be held applicable to navigational charts. Too, even the material before us demonstrates that appellant did present circumstantial evidence from which it could reasonably have been inferred that the omission of Johnson Hill from the approach chart was a proximate cause of the crash. (*Campbell* v. *General Motors Corp., supra,* 32 Cal.3d 112, 121.)

The legend to this chart contained information which might well have led a pilot to conclude the highest obstacles in the immediate environs of the airport would be depicted on respondent's chart. For example, it states "[a] reference circle, 5 statute miles in radius, is centered on the airport to *emphasize obstructions* and other information close to the airport." After listing the symbols utilized to identify the various obstacles shown on the chart, the legend also provides:

"NOTE: The *black dot (.) for obstructions is used to locate—*

"1. *Those which are 50' to 100' above the airport elevation* [*i.e., 1659 feet MSL*] *and within the airport reference circle.*

"2. Those which are 100' to 500' above the airport elevation and outside the reference circle. Lower obstructions are not shown, and *higher obstructions are depicted by a pictorial symbol, if identifiable, or with a structure unknown symbol, if not identifiable.* Contour lines at 1000' intervals (labeled) are used when appropriate to show massive obstructions. They are simplified to clearly present the area of large masses." (Italics added.)

To the degree this information was erroneous or misleading, it exposed to substantial danger (see *Cavers* v. *Cushman Motor Sales, Inc., supra,* 95 Cal.App.3d 338, 349) any pilot who, for whatever reason, descended below the federally prescribed minimum altitudes in effect in the vicinity of Adirondack Airport. It is obvious, of course, that failure to abide by these height regulations might constitute negligence. Nonetheless, it cannot be said as a matter of law that it was unforeseeable a pilot might still engage in such conduct in an attempt to effect a nighttime landing during adverse weather conditions at an airport which had nonprecision approaches and no control tower, as was the case at Adirondack Airport. It is notable that the instant crash occurred while the aircraft was being flown at an altitude sufficient to clear Hill 1991, the highest obstruction in the vicinity of the accident site shown on respondent's chart.

At a minimum, therefore, the court should have informed the jury that this chart could "be found defective in design, even if it satisfie[d] ordinary consumer expectations, if through hindsight the jury determine[d]

that the product's design embodie[d] 'excessive preventable danger,' or, in other words, if the jury [found] that the risk of danger inherent in the challenged design outweigh[ed] the benefits of such design. [Citations.]" (*Barker* v. *Lull Engineering Co.*, *supra*, 20 Cal.3d 413, 430; see BAJI No. 9.00.5 (6th ed. 1983 pocket pt.) p. 86.) In addition, the jury should have been advised that once a plaintiff has made a prima facie showing of proximate cause, the burden shifts to the defendant to prove that the product is not defective, in light of factors such as "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design. [Citations.]" (*Id.*, at p. 431; see BAJI No. 9.00.5 (6th ed. 1983 pocket pt.) p. 87.)

Here the inclusion of Johnson Hill on respondent's chart in accordance with its own design rules apparently could have been accomplished with ease at negligible cost. Respondent, of course, has a legitimate concern that its charts not become too congested, a result which could itself create substantial safety problems. It does not appear, however, that such concern would have prevented the inclusion of Johnson Hill with or without the elimination of the lower Hill 1991; in fact, the FAA mandated its depiction following this tragic accident.

 Respondent additionally urges that the substance of the strict liability doctrine was adequately covered by the implied warranty instructions actually given.[2] Thus it argues, "the Jeppesen Approach Chart could not have been 'fit for the ordinary purposes for which such goods are used' under implied warranty theory, unless it would also 'perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner' under the theory of strict products liability." We disagree.

 While the latter standard has been said to be "*somewhat analogous* to the Uniform Commercial Code's warranty of fitness and merchantability [citation]" (*Barker* v. *Lull Engineering Co.*, *supra*, 20 Cal.3d 413, 429; italics added), the adequacy of a product for purposes of imposing strict

---

[2]The jury received the following instructions on the warranties of fitness and merchantability:

BAJI No. 9.55 "Where the seller at the time of the sale has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is an implied warranty that the goods shall be fit for such purpose."

BAJI No. 9.60 "In a sale of goods such as that which [is claimed] occurred in this case, there is an implied warranty that the goods shall be merchantable. By this we mean that the goods are at least fit for the ordinary purposes for which such goods are used."

liability principles "must be determined in light of its reasonably foreseeable use" and not merely its "intended use." (*Id.*, at p. 426, fn. 9.) As we pointed out in *Self* v. *General Motors Corp.* (1974) 42 Cal.App.3d 1, 7 [116 Cal.Rptr. 575], a manufacturer is required "to foresee some degree of misuse and abuse of his product, either by the user or by third parties, and to take reasonable precautions to minimize the harm that may result from misuse and abuse." (See also *Cronin* v. *J.B.E. Olson Corp., supra,* 8 Cal.3d 121, 126; *Buccery* v. *General Motors Corp.* (1976) 60 Cal.App.3d 533, 547 [132 Cal.Rptr. 605].) The implied warranty instructions, as given, do not convey this requirement.

Moreover, the jury in the instant case was instructed that even if appellant met its burden of demonstrating respondent had failed to comply with one of the implied warranties, in defense respondent needed only to establish that the flight crew had used the chart improperly. Consequently, it was understandable that in their special verdict the jurors would find the instrument approach chart was sufficiently "fit" to be "merchantable" despite respondent's failure to include Johnson Hill. That is to say, this finding may merely have reflected the jury's determination that the "ordinary" purpose for which such charts are purchased is to orient a pilot as he is conducting his approach and, therefore, this flight crew improperly relied upon its topographical information to descend below the federally prescribed minimum altitude in an attempt to land during adverse weather conditions. Of course, even if the chart had been thus misused, recovery under strict liability principles would not necessarily have been totally barred if the jury also had found such misuse a reasonably foreseeable possibility. In sum, we conclude the court's failure to give appellant's requested instructions was prejudicial.

 Similarly the jury's special findings on negligence did not necessarily preclude recovery under strict liability principles.[3] As pointed out in *Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413, "in a strict liability case, as contrasted with a negligent design action, the jury's focus is properly directed to the condition of the product itself, and not to the reasonableness of the manufacturer's conduct. [Citations.] [¶] Thus, the fact that the manufacturer took reasonable precautions in an attempt to design a safe product or otherwise acted as a reasonably prudent manufacturer would have under the circumstances, while perhaps absolving the manufacturer of

---

[3]The jury's special verdict included findings that there was negligence on the part of the flight crew, but not respondent, and that the flight crew's negligence was a proximate cause of the accident. When asked, "[a]ssuming that 100% represents the total combined negligence of the plaintiff's crew and of the defendant, including any breach of warranty, contributed as a proximate cause of the accident involved in this case, [*sic*] what proportion of such combined negligence and breach of warranty is attributable to the plaintiff on the one hand and what proportion is attributable to the defendant on the other hand," the jury attributed 100 percent of the negligence to appellant.

liability under a negligence theory, will not preclude the imposition of liability under strict liability principles if, upon hindsight, the trier of fact concludes that the product's design is unsafe to consumers, users, or bystanders. [Citation.]" (*Id.*, at p. 434.)

 We do not intend by the foregoing discussion to suggest that the question of the crew's alleged negligence may not have determinative significance. Comparative fault principles have been extended to actions founded on strict liability. However, for purpose of apportionment, appellant's *conduct* is to be compared not to the respondent's *conduct,* but to its *product.* (*Daly* v. *General Motors Corp.* (1978) 20 Cal.3d 725, 737, 743 [144 Cal.Rptr. 380, 575 P.2d 1162].) This was not done, and could not have been done, under the instructions given here.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with the views expressed herein.

Roth, P. J., and Beach, J., concurred.

A petition for a rehearing was denied August 22, 1985, and respondent's petition for review by the Supreme Court was denied October 17, 1985.