**JOSEPH BIRMINGHAM** and **GAIL BIRMINGHAM**, Plaintiffs–Appellants, v. **FODOR'S TRAVEL PUBLICA-TIONS, INC.**, a New York corporation, Defendant–Appellee, and **STATE OF HAWAII, COUNTY OF KAUAI, JOHN DOES 1–10, DOE PARTNERSHIPS 1–10**, and **DOE COR-PORATIONS 1–10**, Jointly and Severally, Defendants

NO. 15263

**JOSEPH BIRMINGHAM** and **GAIL BIRMINGHAM**, Plaintiffs–Appellants, v. **STATE OF HAWAII** and **COUNTY OF KAUAI**, Defendants–Appellees, and **FODOR'S TRAVEL PUBLICATIONS, INC.**, a New York corporation, **JOHN DOES 1–10, DOE PARTNERSHIPS 1–10**, and **DOE CORPORATIONS 1–10**, Jointly and Sever-ally, Defendants

NO. 15384

(CIV. NO. 90–0054)

JULY 20, 1992

LUM, C.J., WAKATSUKI, MOON,
KLEIN, AND LEVINSON, JJ.

360

OPINION OF THE COURT BY LEVINSON, J.

The plaintiffs–appellants Joseph and Gail Birmingham (the Birminghams) appeal orders entered March 13, 1991, June 4, 1991, and June 10, 1991, granting summary judgment on their negligence claims in favor of the defendants–appellees Fodor's Travel Publications, Inc. (Fodor's), State of Hawaii (State), and County of Kauai (County). On the record before us, we answer the following question: Did Fodor's, the State and/or the County owe the Birminghams a duty to warn of ocean surf conditions? For the reasons set forth in this opinion, we answer in the negative as to Fodor's and the State. As to the County, we find that there are genuine issues of material fact precluding summary judgment. Accordingly, we affirm the circuit court's orders as to Fodor's and the State, and reverse and remand as to the County.

I.

Fodor's is a publisher of travel guides and has published over 700 different travel titles world–wide since 1949. Fodor's does not author these publications, accepting writings from different travel writers regarding their personal observations and comments on locations they visit throughout the world. In 1987, Fodor's published *Fodor's Hawaii 1988* (the Guide), a travel

guide to the Hawaiian Islands. The Guide was compiled, researched, and edited by an international team of travel writers, field correspondents, and editors, and has been published world–wide. The Guide provides numerous descriptions of various locations and subjects to apprise the general public of choices regarding travel to and activities in the Hawaiian Islands. Fodor's neither expressly guarantees, warrants, nor endorses the locations and subjects as to which the Guide provides descriptions and information.

In February 1988, the Birminghams bought a copy of the Guide in Texas, in preparation for their honeymoon trip to Hawaii. The Birminghams were especially interested in information on the Island of Kauai. Based on information derived from the Guide, specifically the section on Kekaha Beach,[1] the Birminghams decided to go to Kekaha Beach to body surf, swim, and relax. Shortly after arriving at Kekaha Beach on March 15, 1988, Joseph Birmingham (Joseph) sustained personal injuries from body surfing in ocean waters off Kekaha Beach. The beach land fronting the ocean waters where the body surfing accident occurred is owned by the State but has never been designated or used as a State park. This parcel (the Kekaha Beach Addition) consists of approximately 30.70 acres of land and was set aside on April 3, 1951, by Executive Order No. 1425, to be controlled and managed by the County for use as an addition to the Kekaha Beach Park.

The bulk of Kekaha Beach Park is located on the mauka (mountain) side of Kaumualii Highway; the Kekaha Beach Addition is on the makai (ocean) side. Kekaha Beach Park is owned and operated by the County. After the transfer of the Kekaha Beach

---

[1] The section in the Guide that the Birminghams claim they relied on in visiting Kekaha Beach states:

> **Kekaha Beach Park** on the south shore is a long, luxurious strip of sand recalling the beaches of California. Great for dune buggy action!

(Emphasis in original.)

Addition to the County, the State has never exercised any control, management, or maintenance over the area. The State has not improved or built on Kekaha Beach. The only indication of the State's presence anywhere near Kekaha Beach is a sign reading, "Danger – Keep Off," posted near a pile of rocks, and some trash cans located within the State's highway easement. Neither the sign nor the trash cans regulate activity at Kekaha Beach Park. Thus, the County was in sole control and management of Kekaha Beach Park, including the Kekaha Beach Addition, at the time of Joseph's accident.

On February 26, 1990, the Birminghams filed a complaint against Fodor's, the State, and the County. The complaint alleged that: (1) the "Defendants and/or any of them, owned, leased, operated, maintained, cared for, controlled and/or permitted, recommended, encouraged and invited to be used by" the Birminghams, and other members of the public, Kekaha Beach and the adjacent waters; (2) the defendants collectively knew, or in the exercise of reasonable care should have known, that the wave and water conditions along Kekaha Beach were dangerous to swimmers; (3) the defendants failed to warn the Birminghams of these dangerous conditions; and (4) as a result of their failure to warn the Birminghams, the defendants were negligent, legally causing the Birminghams' alleged injuries and damages.

On December 28, 1990, Fodor's moved for summary judgment, contending that, as a matter of law, it owed no duty to the Birminghams. Fodor's claimed that the Guide was analogous to a newspaper or magazine and that no jurisdiction addressing the issue of publisher liability for a publication of general circulation had ever held a publisher liable on the basis of breach of duty to warn, unless the publisher had guaranteed or authored the contents of the publication. The trial court granted summary judgment in favor of Fodor's, and the Birminghams filed a timely appeal to this court.

On March 5, 1991, the State moved for summary judgment on the grounds that, as a matter of law, it was not liable to the Birminghams because it owed them "no duty to warn of hazardous conditions on premises [over] which it [had] neither maintenance, management nor control," and that, even assuming such a duty, the duty to warn was "limited to only unnatural conditions in the ocean and not natural ocean conditions." The County joined in the State's Motion for Summary Judgment, alleging, as á matter of law, that it had no duty to warn the Birminghams of the natural surf conditions existing at Kekaha Beach. The trial court granted summary judgment in favor of both the State and the County on the Birminghams' claims against them, and the Birminghams filed a timely appeal to this court.[2]

## II.

On appeal, the standard of review for the granting of summary judgment is identical to that applicable to the trial court's consideration of the motion. *Cuba v. Fernandez*, 71 Haw. 627, 631, 801 P.2d 1208, 1211 (1990); *First Hawaiian Bank v. Weeks*, 70 Haw. 392, 396, 772 P.2d 1187, 1190 (1989). The party moving for summary judgment has the burden of demonstrating that there is no genuine issue as to any material fact relative to the claim or defense and that the party is entitled to judgment as a matter of law. *First Hawaiian Bank*, 70 Haw. at 396, 772 P.2d at 1190 (citing 10 WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2727, at 121 (1983)). Under this standard of review, we address the question whether Fodor's, the State and/or the County

---

[2] Because Fodor's was granted summary judgment earlier than the State and County, the appeals reached this court at different times. The two matters were not consolidated on appeal, but were nevertheless argued together; because the event giving rise to the claims for relief is the same body surfing accident, we address the appeals together in this opinion.

owed a duty to warn the Birminghams of the wave and ocean conditions off Kekaha Beach.

III.
A.
1.

In determining whether Fodor's owed a duty to warn the Birminghams of the wave and ocean conditions off Kekaha Beach, we address a question heretofore never asked of this court: Is a publisher, that neither authors nor guarantees the accuracy of representations of fact contained in its publication, liable for physical injuries sustained in reliance on information contained in the publication? We begin our inquiry with the basic principle that a negligence action lies only where there is a duty owed by the defendant to the plaintiff. *Bidar v. Amfac, Inc.*, 66 Haw. 547, 551, 669 P.2d 154, 158 (1983) (citations omitted). *See also Johnston v. KFC Nat'l Management Co.*, 71 Haw. 229, 232, 788 P.2d 159, 161 (1990) ("A necessary element in a negligence action is a duty, or obligation, recognized by the law, requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks.") (quoting *Ono v. Applegate*, 62 Haw. 131, 137, 612 P.2d 533, 538 (1980) (internal quotation marks and brackets omitted)). The existence of a duty, that is, whether such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other — or, more simply, whether the interest of a plaintiff who has suffered invasion is entitled to legal protection at the expense of a defendant — is entirely a question of law. *Bidar*, 66 Haw. at 552, 669 P.2d at 158 (citing W. PROSSER, HANDBOOK OF THE LAW OF TORTS § 37, at 206 (4th ed. 1971)).

It appears from a review of relevant case law that no jurisdiction has held a publisher liable in negligence for personal injury suffered in reliance upon information contained in the publication,

unless the publisher authored or guaranteed the information.[3] Whether based on negligent misrepresentation[4] or negligent manufacture of a defective product, the cases uniformly hold, for the same policy reasons, that, absent guaranteeing or authoring the contents of the publication, a publisher has no duty to investigate and warn its readers of the accuracy of the contents of its publications.

In *Alm v. Van Nostrand Reinhold Co.*, 134 Ill. App. 3d 716, 717, 480 N.E.2d 1263, 1264 (1985), the plaintiffs, who suffered physical injury in reliance on a "How To" book in making a wood-carving tool, sought recovery premised on negligent misrepresen-

---

[3] *See, e.g., Jones v. J.B. Lippincott Co.*, 694 F. Supp. 1216, 1216–17 (D. Md. 1988) (publisher who serves function of publishing the contents of an author, other than one of its employees, has no duty of care to its readers with respect to the publication's contents and makes no warranty as to its contents); *Pittman v. Dow Jones & Co.*, 662 F. Supp. 921, 922 (E.D. La.), *aff'd*, 834 F.2d 1171 (5th Cir. 1987) ("[A] newspaper has no duty, whether by way of tort or contract, to investigate the accuracy of advertisements placed with it which are directed to the general public, unless the newspaper undertakes to guarantee the soundness of the products advertised."); *Lewin v. McCreight*, 655 F. Supp. 282, 283 (E.D. Mich. 1987) ("Every case in other jurisdictions that would support a products liability cause of action against a publisher involves a situation in which the publisher actually created, rather than merely printed, the content."); *Hanberry v. Hearst Corp.*, 276 Cal. App. 2d 680, 683–84, 81 Cal. Rptr. 519, 521 (1969) (Good Housekeeping held liable for defective product because it had given the product its "Good Housekeeping's Consumer's Guaranty Seal," whereby publisher had made an independent examination of the product and issued an express, limited warranty).

[4] Restatement (Second) of Torts § 311 (1965) provides:

(1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results

    (a) to the other, or

    (b) to such third persons as the actor should expect to be put in peril by the action taken.

(2) Such negligence may consist of failure to exercise reasonable care

    (a) in ascertaining the accuracy of the information, or

    (b) in the manner in which it is communicated.

tation against the publisher of the book. The publisher had not authored any part of the book. *Id.* at 717, 480 N.E.2d at 1264. The court, noting that the plaintiffs had failed to discover a case in any jurisdiction that imposed liability on a publisher for negligent misrepresentation merely because of publication of material authored by a third party, denied recovery:

> We conclude that no cause of action for negligent misrepresentation should be recognized under the facts of this case. Plaintiff's theory, if adopted, would place upon publishers the duty of scrutinizing and even testing all procedures contained in any of their publications. The scope of liability would extend to an undeterminable number of potential readers.

*Id.* at 721, 480 N.E.2d at 1267.[5] The *Alm* court also observed that a number of courts had declined, on first amendment grounds, to impose such a duty on publishers. In response to the plaintiffs' attempts to distinguish bad advice in a "How To" book from information contained in treatises, the court stated:

> We suspect that such a distinction would lead to further First Amendment problems involving content–based discrimination. [Citation omitted]. More important for our purposes, however, is the chilling effect which liability would have upon publishers, an effect recognized in the cases . . . . Even if liability could be imposed consistently with the Constitution, we believe that the adverse effect

---

[5] *See also Smith v. Linn*, 386 Pa. Super. 392, 397, 563 A.2d 123, 126 (1989) (appellate court, in denying recovery to administrator of estate of reader who died from complications caused by diet followed by reader, held, *inter alia*, that nothing in section 311 (the negligent misrepresentation section of Restatement (Second) of Torts (1965)) suggests they were intended to apply to publishers, nor did case law support section 311 being applied in such a way), *aff'd*, 526 Pa. 447, 587 A.2d 309 (1991).

of such liability upon the public's free access to ideas would be too high a price to pay.

*Id.* at 722, 480 N.E.2d at 1267.

In *Lewin v. McCreight*, 655 F. Supp. 282 (E.D. Mich. 1987), the plaintiffs sustained injury from an explosion that occurred while they were mixing mordant in accordance with instructions in a book entitled *The Complete Metalsmith*. The publisher of the book had not authored any part of the book. *Id.* at 283. The question presented to the court, one of first impression under Michigan law, was whether a claim against a publisher "for failure to warn of 'defective ideas' was cognizable under Michigan law." *Id.* The court, relying heavily on the policies set forth in *Alm*, declined to hold that a publisher had a duty to warn the reading public of the contents of its publications. The *Lewin* court stated:

> This Court agrees with the court in *Alm* that given the tremendous burden such a duty would place upon defendant publishers, the weighty societal interest in free access to ideas, and potentially unlimited liability, it would be unwise to impose a duty to warn of "defective ideas" upon publishers of information supplied by third party authors.

*Id.* at 284.

In *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033 (9th Cir. 1991), the plaintiffs, in reliance on descriptions in *The Encyclopedia of Mushrooms*, a reference guide containing information on the habitat, collection, and cooking of mushrooms, picked certain mushrooms. After cooking and eating these mushrooms, they became seriously ill. *Id.* at 1034. The publisher had neither authored nor edited the book. *Id.* The plaintiffs sued the publisher of the book, "alleg[ing] that the book contained erroneous and misleading information concerning the identification of the most deadly species of mushrooms." *Id.*

On the plaintiffs' negligence claim, the Ninth Circuit affirmed the district court's grant of summary judgment in favor of the publisher, stating:

> We conclude that the defendants have no duty to investigate the accuracy of the contents of the books it publishes. A publisher may of course assume such a burden, but there is nothing inherent in the role of publisher or the surrounding legal doctrines to suggest that such a duty should be imposed on publishers. Indeed the cases uniformly refuse to impose such a duty. Were we tempted to create this duty, the gentle tug of the First Amendment and the values embodied therein would remind us of the social costs.

*Id.* at 1037 (footnotes and citations omitted).[6] The court further held that, because a publisher had no duty to investigate the accuracy of the contents of its publication, the publisher had no duty to warn its readers that the information was incomplete and not to be relied on, or that the publisher could not guarantee the accuracy of the information. *Id.* at 1037–38.

We have stated that we are "reluctant to impose a new duty upon members of our society without any logical, sound, and compelling reasons taking into consideration the social and human relationships of our society." *Johnston*, 71 Haw. at 232–33, 788 P.2d at 161. As illustrated by the foregoing cases, there are compelling policy reasons, apparently recognized by all jurisdictions addressing the issue, that militate against imposing a duty on a publisher to warn of the accuracy of its publication, absent authorship or warranty of the publication's contents. Therefore, we hold that a publisher of a work of general circulation, that neither authors nor expressly guarantees the contents of its publication,

---

[6] In footnote 8, the Ninth Circuit cited eleven cases as support for its statement that "cases uniformly refuse to impose a duty." *Id.*

has no duty to warn the reading public of the accuracy of the contents of its publication.

Because the Guide was a work of general circulation, and Fodor's neither authored nor expressly guaranteed the contents of the Guide, Fodor's had no duty to warn the Birminghams of the accuracy of the information contained in the Guide. Therefore, the trial court was correct in granting summary judgment in favor of Fodor's on the Birminghams' negligence claim against it.

2.

On appeal, the Birminghams also argue a strict liability theory premised on the theory that the Guide is a "product," although they neither expressly pled it in their complaint nor in their Memorandum in Opposition to Fodor's Motion for Summary Judgment. Fodor's contends that because the complaint only alleged a claim for relief based on negligence, this court should not address the Birminghams' strict liability argument.

The general rule in this jurisdiction is that we will not address a legal theory not raised by the appellant in the court below. *See, e.g., Earl M. Jorgensen Co. v. Mark Constr., Inc.,* 56 Haw. 466, 475, 540 P.2d 978, 985 (1975). However, the Birminghams orally asserted a products liability theory in opposing Fodor's summary judgment motion. Products liability is a form of strict liability. *Bidar,* 66 Haw. at 555, 669 P.2d at 160. *See also Stewart v. Budget Rent-A-Car Corp.,* 52 Haw. 71, 74, 470 P.2d 240, 243 (1970) ("[I]t is the modern trend and the better reasoned view that strict liability in tort is a sound legal basis for recovery in products liability cases.") Moreover, in opposing Fodor's motion, the Birminghams specifically cited cases decided on strict liability grounds, and the trial court apparently considered the products liability theory in rendering its decision. Therefore, because the circuit court considered the Birminghams' strict/products liability theory in the context of Fodor's motion for summary judgment, we

will address the question of Fodor's liability under strict/products liability.[7]

The Birminghams argue that the Guide is a "product" and that Fodor's is strictly liable for the Birminghams' injuries. Unless the Guide can be considered a "product," the Birminghams have no claim for relief based on strict products liability. *See Bidar*, 66 Haw. at 554–55, 669 P.2d at 160–61 (holding the allegation that "a portion of . . . leased or rented premises proved defective" was insufficient to invoke the doctrine of strict liability in tort, because such an allegation did not identify a defective product);[8] *see also Messier v. Association of Apartment Owners of Mt. Terrace*, 6 Haw. App. 525, 533–35, 735 P.2d 939, 946–47 (1987) (holding that a "building is not a product" for strict liability purposes).

The Birminghams cite three cases as authority for their contention that information in a publication is a "product": *Brocklesby v. United States*, 767 F.2d 1288 (9th Cir. 1985), *cert. denied*, 474 U.S. 1101 (1986); *Saloomey v. Jeppesen & Co.*, 707 F.2d 671 (2d Cir. 1983); and *Fluor Corp. v. Jeppesen & Co.*, 170 Cal. App. 3d 468, 216 Cal. Rptr. 68 (1985). The publications in these cases were aeronautical approach charts graphically

---

[7] Furthermore, even if we considered the strict liability claim as raised for the first time on appeal, we have the discretion to hear new issues based on three factors: " 'Whether consideration of the issue requires additional facts; whether the resolution of the question will affect the integrity of the findings of fact of the trial court; and whether the question is of great public import.' " *Earl M. Jorgensen Co.*, 56 Haw. at 476, 540 P.2d at 985 (citing *Fujioka v. Kam*, 55 Haw. 7, 9, 514 P.2d 568, 570 (1973)). Because the determination of the strict liability claim requires no additional facts, the trial court rendered no findings of fact, and the issue is one of first impression in this jurisdiction, we would be justified in addressing this issue on appeal even if it had not been raised in the court below. *Id. See also Cabral v. McBryde Sugar Co.*, 3 Haw. App. 223, 226–27, 647 P.2d 1232, 1234 (1982) (discretion exercised in addressing strict liability claim not raised below).

[8] In *Bidar*, the plaintiff sustained injuries when, as a guest of a hotel, she grabbed a towel bar in her hotel room as support in rising from a toilet seat. 66 Haw. at 554, 669 P.2d at 160.

depicting the instrument approach procedure for the particular air-
port as that procedure had been promulgated by the Federal Avia-
tion Administration (FAA). *Brocklesby*, 767 F.2d at 1294–95.
The publisher in all three cases had produced approximately 8,000
to 9,000 charts world–wide, of which approximately 5,000 were
published for some 2,300 airports in the United States. *Fluor*, 170
Cal. App. 3d at 474 n.1, 216 Cal. Rptr. at 70 n.1. As a result of
inaccuracies in these charts,[9] reliance by aircraft pilots on these
charts resulted in crashes.

In each of the "aeronautical chart cases," the courts found
the existence of a "product" on two grounds. First, because the
charts prescribed an approach procedure that included "all perti-
nent aspects of the approach such as directional heading, distances,
minimum altitudes, turns, radio frequencies and procedures to be
followed if an approach is missed," any inaccuracies would
render the charts unreasonably dangerous for their intended use.
*Brocklesby*, 767 F.2d at 1295. Second, "the mass production and
marketing of these charts require[d] [the publisher] to bear the
costs of accidents that [were] proximately caused by defects in the
charts." *Saloomey*, 707 F.2d at 677 (quoted in *Brocklesby*, 767
F.2d at 1295; *Fluor*, 170 Cal. App. 3d at 474, 216 Cal. Rptr. at 70).

Based on the foregoing authority, the Birminghams argue
that "a publication is a product." However, in *Brocklesby*, the
Ninth Circuit specifically distinguished the aeronautical charts
from other general publications, stating that "[i]f . . . a trade journal
had . . . published the government's instrument approach proce-
dure in text form and a pilot had used the procedure as printed in
the journal, the journal would be immune from strict liability." 767

---

[9] The publisher of the chart had taken the specifications prescribed by the FAA
in tabular form and had portrayed the information on graphic approach charts.
*Brocklesby*, 767 F.2d at 1292. In *Saloomey* and *Fluor*, the inaccuracies were due
to the publisher including or excluding certain information on or from the charts.
*Saloomey*, 707 F.2d at 677; *Fluor*, 170 Cal. App. 3d at 479, 216 Cal. Rptr. at 72.

F.2d at 1297–98. By contrast, the charts were "distinct products," because the charts were "more than just a republication of text," inasmuch as they converted "text into graphic form and represent[ed] that the chart[s] contain[ed] all necessary information." *Id.* at 1298.

Moreover, in *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033 (9th Cir. 1991), the Ninth Circuit recently refused to extend its holding in *Brocklesby* to a reference book dealing with the various species of mushrooms. Concluding that the "aeronautical chart cases" were an aberration, the Ninth Circuit ruled:

> Aeronautical charts are highly technical tools. They are graphic depictions of technical, mechanical data. The best analogy to an aeronautical chart is a compass. . . . Computer software that fails to yield the result for which it was designed may be another. In contrast, *The Encyclopedia of Mushrooms* is like a book on how to *use* a compass or an aeronautical chart. The chart itself is like a physical "product" while the "How to Use" book is pure thought and expression.

> Given these considerations, we decline to expand products liability law to embrace the ideas and expression[s] in a book. We know of no court that has chosen the path to which the plaintiffs point.

*Id.* at 1036 (emphasis in original and footnotes omitted).[10]

The *Winter* court discussed the special attributes of ideas and expressions that militated against treating them as "products":

---

[10] Other jurisdictions have distinguished the "aeronautical chart cases" on similar grounds. *See, e.g., Jones v. J.B. Lippincott Co.*, 694 F. Supp. 1216, 1217 (D. Md. 1988) ("The underlying theory for these rulings is the analogy of a nautical chart or an airline chart to other instruments of navigation such as a compass or radar finder which, when defective, will prove to be dangerous."); *Smith v. Linn*,

The purposes served by products liability law . . . are focused on the tangible world and do not take into consideration the unique characteristics of ideas and expression. . . .

Although there is always some appeal to the involuntary spreading of costs of injuries in any area, the costs in any comprehensive cost/benefit analysis would be quite different were strict liability concepts applied to words and ideas. We place a high priority on the unfettered exchange of ideas. We accept the risk that words and ideas have wings we cannot clip and which carry them we know not where. The threat of liability without fault (financial responsibility for our words and ideas in the absence of fault or a special undertaking or responsibility) could seriously inhibit those who wish to share thoughts and theories. As a New York court commented, with the specter of strict liability, "[w]ould any author wish to be exposed . . . for writing on a topic which might result in physical injury? e.g. [sic] How to cut trees; How to keep bees?" [Citation omitted]. One might add: "Would anyone undertake to guide by ideas expressed in words either a discrete group, a nation, or humanity in general?"

*Id.* at 1034–35.

We find the reasoning of the Ninth Circuit in *Winter* to be persuasive. Therefore, we hold that the Guide is not a "product," and the Birminghams have no claim for relief based on strict/product liability against Fodor's.

---

386 Pa. Super. 392, 399, 563 A.2d 123, 127 (1989) ("In those cases, extremely technical and detailed materials were involved, upon which a limited class of persons imposed absolute trust having reason to believe in their unqualified reliability. As such they took on the attributes of a product and are not protected by the first amendment."), *aff'd*, 526 Pa. 447, 587 A.2d 309 (1991).

## B.

## 1.

On March 1, 1991, the County filed a Motion for Partial Summary Judgment on the grounds that the County had not, at any time, "owned, leased, operated, maintained, cared for, [and/or] controlled" the waters adjacent to Kekaha Beach, because, pursuant to Hawaii Revised Statutes (HRS) § 266–1,[11] the State "owned, leased, operated, maintained, cared for, [and] controlled" the water and beach to the high wash of the waves. The trial court granted the County's motion, ruling that:

> Defendant County of Kauai did not own, lease, operate, maintain, care for or control certain real property beach frontage and adjacent waters, at, near, or in the vicinity of Kekaha Beach Front for the reason that the State of Hawaii owned, leased, operated, maintained[,] cared for and controlled the waters and beach to the high wash of the waves under Section 266–1, H.R.S.

Accordingly, the trial court ruled that the State was the owner and occupier of the ocean waters and shoreline fronting the Kekaha Beach Addition up to the high wash of the waves. Because neither the State nor the County appealed this ruling, it is conclusive for purposes of the present appeal.

---

[11] HRS § 266–1 (1985) provides:

All ocean shores below mean highwater mark, shore waters and navigable streams, and all harbors and roadsteads, and all harbor and waterfront improvements, belonging to or controlled by the State, and all shipping within the harbors, roadsteads, waters, and streams shall be under the care and control of the department of transportation.

Beginning on July 1, 1992, care and control of the State's ocean waters and shorelines is transferred to the State Department of Land and Natural Resources under the "Ocean Recreation and Coastal Areas Programs Act." Act 271, sections 3 and 4, 1991 Haw. Sess. Laws 608, 608–10.

In *Littleton v. State*, 66 Haw. 55, 656 P.2d 1336 (1982), the trial court ruled identically against the State and held, on the facts before it, that the State owed the plaintiff a duty of ordinary care for her safety. *Id.* at 58, 656 P.2d at 1340 (citing *Asato v. Matsuda*, 55 Haw. 334, 519 P.2d 1240 (1974)).[12] The plaintiff had gone to Ewa Beach Park (owned, maintained, and controlled by the City and County of Honolulu) to pick seaweed; after proceeding through the park to the ocean, she was injured by a telephone pole floating in the water. *Id.* at 56–57, 656 P.2d at 1339. The trial court found that the vicinity of the accident, including the park and the abutting beaches and shoreline, "were easily accessible to the public for ogo [seaweed] picking and water–related activities" for a period of more than fifteen years and "that the State had knowledge of this fact." *Id.* at 59, 656 P.2d at 1340. It further found that the cause of the accident — floating telephone poles and similar debris in the water — had been observed "continually as often as two or three times a week in the waters and on the beaches within the vicinity" of the accident for a period of more than seventeen years before the accident and that the State "had actual as well as constructive notice of this fact." *Id.* at 60, 656 P.2d at 1341. Finding that the poles and other debris "constituted an unreasonable danger to the safety of persons" engaging in water–related activities and that the plaintiff had not been contributorily negligent as to her injuries, the trial court found the State liable for the plaintiff's injuries, because the State had a duty, based on its actual and constructive notice of the unreasonable danger, to warn of the danger by posting signs and to take steps to clean up the debris and prevent its occurrence. *Id.* at 57, 656 P.2d at 1339.

On appeal in *Littleton*, this court affirmed the trial court's judgment against the State with the following caveat:

---

[12] The plaintiff in *Asato* had been injured under circumstances virtually identical to those present in *Littleton*.

This is not to say, however, that the State is under a continuing duty to inspect and warn of dangerous *unnatural* conditions along every inch of Hawaii's coastlines. Such a requirement would place an unrealistic and intolerable burden upon the State. But on facts similar to Asato, or analogous thereto, the State does have a duty, at the very least, to warn the public of such dangerous *unnatural* conditions.

*Id.* at 63 n.2, 656 P.2d at 1342 n.2 (emphasis added).

The *Littleton* rule, which we reaffirm today, is that the State, as the owner and occupier of the ocean water and all the beach area up to the high water mark adjacent to a municipal beach park, does not owe a duty to persons injured as a result of water–related activities, unless the "facts are similar to *Asato*, or analogous thereto." To determine whether there are facts similar to *Asato*, the court must determine: (1) whether the condition causing the injury was a dangerous *unnatural* condition in the area of the water–related activity; and (2) whether the State had actual or constructive knowledge of the condition. If the court determines both that a dangerous *unnatural* condition existed and that the State had actual or constructive knowledge of the condition, then the State has a duty to warn of the condition by taking whatever measures, if any, are reasonably available to rectify and prevent the condition.

In the present case, the question whether the State owed a duty to the Birminghams to warn them of the wave conditions off Kekaha Beach is entirely a question of law. *See, e.g., Bidar v. Amfac, Inc.*, 66 Haw. 547, 552, 669 P.2d 154, 158 (1983). If there is no "genuine issue" as to the absence of either of the *Littleton* factors enumerated above, then the summary judgment in favor of the State and against the Birminghams must be affirmed, because the State would have no duty to warn the Birminghams.

Joseph was injured while body surfing in ocean waters off Kekaha Beach. A wave is a naturally occurring phenomenon of the ocean — not a man–made object such as the floating poles, logs, and pilings at issue in *Littleton*. A wave may be a dangerous condition of the ocean, but, by its very nature, cannot be an *unnatural* condition.[13] Because the ocean condition causing Joseph's injury was not a dangerous unnatural condition, the first requirement of the *Littleton* test is not met, and the State had no duty to warn the Birminghams of the wave conditions off Kekaha Beach.[14] Therefore, the trial court correctly granted summary judgment in favor of the State.

### 2.

The County's duty, if any, to warn the Birminghams of the wave and ocean conditions off Kekaha Beach Park, including the

---

[13] "The ocean and its beaches are inherently dangerous. Those of us who grow up and live in Hawaii respect the ocean for its often awesome power." *Asato*, 55 Haw. at 334, 519 P.2d at 1240 (Richardson, C.J., dissenting).

[14] The evidence that the Birminghams presented on the issue whether the ocean surf fronting the Beach was a dangerous unnatural condition was Joseph's statement that:

> [W]hen I experienced the surf on Kekaha Beach, I found it to be unnatural in the sense that it was stronger and broke in a manner distinctly different from the type of surf that I was used to on the Atlantic Coast and in the Gulf and that I had observed on the California Coast.

(Affidavit of Joseph Birmingham, Record, Vol. 3, at 562.) Were we to accept such a subjective standard for determining when a condition is an unnatural condition, the State's liability would be limitless.

Furthermore, although the Birminghams offered no specific evidence that the State had actual or constructive knowledge of the dangerousness of the surf off Kekaha Beach to body surfers, they adduced extensive evidence of general knowledge that body surfing can be a dangerous activity. However, the Birminghams adduced no evidence that other body surfing accidents had occurred off the Kehaha Beach Addition, or that the area was known for having dangerous surf. In any event, whether or not the State had actual or constructive knowledge of the wave conditions, the fact would still remain that such conditions are "natural."

Kekaha Beach Addition, is based on the County being the owner and occupier of Kekaha Beach Park. The County, as an occupier of land, "has a duty to use reasonable care for the safety of all persons reasonably anticipated to be upon the premises . . . ." *Pickard v. City & County of Honolulu*, 51 Haw. 134, 135, 452 P.2d 445, 446 (1969). Moreover, we have held that an occupier of land fronting the shoreline of the ocean has "a duty to warn users . . . of extremely dangerous conditions in the ocean along its beach frontage which were not known or obvious to persons of ordinary intelligence, and which were known or in the exercise of reasonable care ought to have been known to the [occupier]." *Kaczmarczyk v. City & County of Honolulu*, 65 Haw. 612, 615, 656 P.2d 89, 92 (1982).

In *Kaczmarczyk*, this court reversed a summary judgment in favor of the City and County of Honolulu (City) on the issue of the City's negligence in the death of a man off Ehukai Beach Park, following the holding of *Tarshis v. Lahaina Investment Corp.*, 480 F.2d 1019 (9th Cir. 1973). In *Tarshis*, the plaintiff was a guest at the defendant's hotel and was injured in surf while swimming in the ocean that fronted the hotel. *Id.* at 1020. The *Kaczmarczyk* court, noting that the Ninth Circuit had reversed the district court's order granting summary judgment in favor of the defendant, stated:

> The federal appellate court, however, reversed and pointed out that the question of whether [or not] the ocean fronting the [hotel's] property would have appeared dangerous to an[y] ordinarily intelligent person [is a question] of fact inappropriate for summary adjudication. It held:

>> On the basis of this evidence, [the plaintiff] is entitled to present to a trier of fact her theory that the existence of the powerful, surging surf

represented an unapparent, dangerous condition
which [the defendant] knew about and of which
it failed to adequately warn her.

65 Haw. at 616, 656 P.2d at 92 (quoting *Tarshis*, 480 F.2d at 1021).

In *Tarshis*, the plaintiff, in response to the hotel's allegation that it had posted signs warning of the "dangerous surf conditions," claimed that she neither observed such signs nor received any verbal warnings from the hotel. 480 F.2d at 1020. Noticing only "slight waves," the plaintiff entered the ocean "where five to ten minutes later, [the plaintiff] was thrown on the beach by a 'huge wave.'" *Id.* The hotel adduced evidence that the surf on the day of the accident was "like that usually experienced during a typical trade wind day," but did not offer any evidence that the plaintiff should have known that the surf was dangerous. *Id.* at 1021. Based on this record, the court held that "the plaintiff is entitled to present to the trier of fact her theory that the existence of the powerful, surging surf represented an unapparent, dangerous condition which [the hotel] knew about and of which it failed to adequately warn her." *Id.*

Based on *Tarshis*, the *Kaczmarczyk* court found that there were two genuine issues of material fact requiring reversal of the summary judgment: (1) whether the ocean conditions were "extremely dangerous conditions which were not readily apparent to persons of ordinary intelligence;" and (2) "whether, in getting to the beach, the deceased . . . entered through Ehukai Beach Park which was incontestably under the control and management of the City, or whether their route took them over property not owned or controlled by it." 65 Haw. at 616–17, 656 P.2d at 92–93. Neither of these issues had been addressed by the circuit court in its determination that the City was entitled to summary judgment.

Subsequently, in *Kamakawiwoole v. State*, 6 Haw. App. 235, 718 P.2d 1105 (1986), the Hawaii Intermediate Court of Appeals

(ICA) reversed a summary judgment in favor of the State and against the plaintiff, who was injured in a fall on a landing ramp, which was built in ocean water near the shore, situated within the Army's *de facto* public park and surrounded by the State's *de facto* public park. Both parks fronted the public beach and ocean. The ICA found that there was a genuine issue of material fact as to "whether the State impliedly invited [the plaintiff] to use the Army's property." *Id.* at 235, 718 P.2d at 1106.

The ICA based its reversal on its analysis of *Tarshis*, *Kaczmarczyk*, and *Littleton*, stating:

> These cases state a rule that an occupier of land fronting the beach and ocean who induces or invites a business or public invitee onto its land to engage in an action on the adjoining public beach or ocean may owe a duty to warn that invitee of the dangers involved in engaging in the action. In *Littleton*, [citation omitted] the supreme court stated that the "invitation [to use the premises where the accident occurred] may be implied" from the "continued and general custom of the patrons of the place."

*Id.* at 237–38, 718 P.2d at 1107 (citation and footnotes omitted). The ICA observed that, in *Tarshis*, *Kaczmarczyk*, and *Littleton*, the "invitation" had been implied "where the plaintiff . . . went from defendant's land onto the adjoining public beach or ocean where he was injured or killed." *Id.* at 238 n.4, 718 P.2d at 1107–08 n.4.

Applying *Kaczmarczyk* and *Kamakawiwoole* to the present case, the County's liability, if any, is based on two determinations: (1) whether the Birminghams were impliedly invited onto Kekaha Beach by the County, because, in obtaining access to Kekaha Beach, they passed through Kekaha Beach Park, including the Kekaha Beach Addition; and (2) if the Birminghams were impliedly invited by the County onto Kekaha Beach, whether the ocean conditions were "extremely dangerous conditions which

were not readily apparent to persons of ordinary intelligence." Inasmuch as the record before us presents genuine issues of material fact regarding both determinations,[15] we must reverse the circuit court's entry of summary judgment in favor of the County and against the Birminghams. *See Littleton*, 66 Haw. at 68, 656 P.2d at 1345; *Kaczmarczyk*, 65 Haw. at 616–17, 656 P.2d at 92; *Kamakawiwoole*, 6 Haw. App. at 240, 718 P.2d at 1109.

## III.

We conclude, as a matter of law, that: (1) Fodor's did not owe a duty to warn the Birminghams of the accuracy of the contents of the Guide; (2) the Guide is not a "product" for purposes of strict/

---

[15] The only evidence in the record of what route the Birminghams took in getting to Kekaha Beach is a portion of Joseph's deposition:

Q: Any other stops prior to arriving at Kekaha Beach?

A: As we returned down from Waimea Canyon, Gail asked if we could stop at a store and see if we could get some beach mats.

Q: Did you?

A: I don't believe we bought the mats.

Q: But you did stop at a store?

A: Yes.

Q: And was that on the canyon road, or had you come back down to the main highway near the beach?

A: We had come back down to the main highway near the beach, drove into this little town and then drove back out to Kekaha Beach.

Q: Did you go — okay. You came back down from the canyon. And then you met the main highway, the road that runs along the ocean, did you turn left or right?

A: I believe it's left back into the small town, and we came back out, which would be like turning right again.

Q: So you went to your left, went into the small town, stopped at the store, and then backtracked a certain distance?

A: Yes. That's how I recall it.

Q: And stopped then at or near Kekaha Beach?

A: That is correct. That is my opinion.

product liability analysis; and (3) the State had no duty to warn the Birminghams of the surf conditions off Kekaha Beach. We therefore affirm the circuit court's orders granting summary judgment in favor of Fodor's and the State. However, because there are genuine issues of material fact as to whether the Birminghams were impliedly invited onto Kekaha Beach by the County, and if so, whether the ocean conditions were extremely dangerous conditions which were not readily apparent to persons of ordinary intelligence, we reverse the circuit court's order granting summary judgment in favor of the County and remand for further proceedings consistent with this opinion.[16]

*Thomas L. Mui* (Chang, Mui & Chock, of counsel), for plaintiffs–appellants.

*Edward J. Bybee* (*Nelson S. W. Chang* with him on the brief; Bybee, Chang & Rulon, of counsel), for defendant–appellee Fodor's Travel Publications, Inc.

*Wesley F. Fong*, Deputy Attorney General (*Norma Desantis Titcomb* with him on the brief), for defendant–appellee State of Hawaii.

*Harvey E. Henderson, Jr.* (*Michael H. Tsuchida* with him on the brief; Moon, O'Connor, Tam & Yuen, of counsel), for defendant–appellee County of Kauai.

---

[16] If, on remand, a determination is made that the Birminghams were impliedly invited to Kekaha Beach Park, including the Kekaha Beach Addition, and therefore that the County owed the Birminghams a duty to warn of "extremely dangerous conditions" in the ocean area fronting Kekaha Beach Park, the issue whether the surf conditions were "extremely dangerous" will have to be addressed. Based on *Kaczmarczyk*, the appropriate inquiry would then be whether the ocean surf represented (1) an "extremely dangerous condition," (2) of which the County was aware and about which it failed adequately to warn the Birminghams, and (3) of which the Birminghams had no knowledge.